**Paul Stedman CULLEN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 3–90–148–CR.**

Court of Appeals of Texas, Austin.

June 24, 1992.

**790**

Terrence W. Kirk, Austin, for appellant.

Ronald Earle, Dist. Atty., Philip A. Nelson, Jr., Asst. Dist. Atty., Austin, for appellee.

Before CARROLL, C.J., and ABOUSSIE and SMITH, JJ.

SMITH, Justice.

Paul Stedman Cullen appeals his conviction for criminal mischief, *see* Tex.Penal Code Ann. § 28.03 (1989 & Supp.1992)[1], arising from his poisoning of the historic "Treaty Oak" in Austin. This particular oak tree enjoys a notoriety based on its age and on historical accounts that Stephen F. Austin signed a treaty with Central Texas Indian tribes on this site. Appellant brings three points of error challenging (1) the trial court's exercise of jurisdiction, (2) the introduction of evidence obtained from a warrantless search, and (3) the jury instructions relating to the alleged destruction of the oak tree. We will affirm the conviction.

## BACKGROUND

Appellant's arrest and conviction stem from his indictment for the damage and destruction of the Treaty Oak. Appellant was accused of applying the herbicide hexazinone to the historic tree without the consent of the tree's owner, causing pecuniary damage in an amount exceeding $20,-000. His indictment contained an enhancement provision because appellant had previously been convicted of a burglary offense.

Appellant filed a pre-trial motion to quash the indictment, alleging that his prosecution should come under the Texas statute prohibiting the desecration of venerated objects. *See* 1973 Tex.Gen.Laws, ch. 399, § 1, at 883, 957 (Tex.Penal Code Ann. § 42.09, since amended). A violation of this statute is a Class A misdemeanor, *see* § 42.09(c), and its violation carries a less severe penalty than does the violation of the criminal mischief statute, a second-degree felony when pecuniary damage exceeds $20,000. *See* § 28.03(b)(5). The trial court overruled the motion and, over a plea of not guilty, the jury tried and convicted appellant of second-degree criminal mischief. He was subsequently sentenced to nine years in prison and was fined $1,000.

## JURISDICTIONAL CHALLENGE

■ Appellant first assails the trial court's exercise of jurisdiction. He claims that the district court lacked jurisdiction to try him since he should have been charged with the "special" misdemeanor offense of desecration of a venerated object, which was not within the district court's jurisdiction. Appellant asserts that the misdemeanor statute and the felony criminal mischief statute are *in pari materia*, meaning they touch upon the same subject, have the same general purpose and relate to the same conduct. *In pari materia* is a rule of statutory construction that requires such statutes to be construed together, even if they contain no reference to each other. Appellant argues that the misdemeanor, desecration of a venerated object, is a detailed statute subsumed within the general felony offense of criminal mischief. Because it more specifically proscribes the conduct of poisoning a tree and sets forth a different punishment, he insists that the doctrine of *in pari materia* required the State to charge him with the more specific misdemeanor offense. We disagree.

■ In *Cheney v. State*, 755 S.W.2d 123 (Tex.Crim.App.1988), the court of criminal appeals discussed at length the doctrine of *in pari materia* as a principle of statutory interpretation and laid out an analytical framework for its application to criminal statutes. A reviewing court must first determine whether both provisions cover the same general subject matter or persons, and have a similar purpose or objective. If two statutes do not deal with the same subject, persons, or purposes, they are not *in pari materia* and other rules of statutory construction will dictate which one governs the offense in question. *Id.* at 127. If the statutes are *in pari materia*, the reviewing court must determine if they conflict by setting out different punishment for the same conduct. In this circumstance, the more specific statute controls. *Id.*

Section 28.03 is a general property-damage offense; its purpose is to proscribe

---

**1.** Unless otherwise noted, all statutory cites are to the Texas Penal Code.

knowing or intentional damage or destruction to an owner's property. *See* § 28.03, Cmt. (1989). The statute's penalty provisions focus upon the amount of pecuniary loss associated with the damage or destruction to the property; lesser losses yield misdemeanor offenses; larger pecuniary losses constitute felonies. *See* § 28.-03(b)(1–5). By contrast, section 42.09 addresses offenses against public order and decency. The desecration statute in effect at the time of the offense provided that

 (a) A person commits an offense if he intentionally or knowingly desecrates:

 (1) a public monument;

 (2) a place of worship or burial; or

 (3) a state or national flag.

 (b) For purposes of this section, "desecrate" means deface, damage, or otherwise physically mistreat in a way that the actor knows will seriously offend one or more persons likely to observe or discover his actions.

 (c) An offense under this section is a Class A misdemeanor.

1973 Tex.Gen.Laws Ch. 399, § 1, at 957 (Tex.Penal Code Ann. § 42.09, since amended). The legislature has placed the desecration statute in Title 9, entitled "Disorderly Conduct and Related Offenses." Section 42.09 focuses upon conduct which the actor knows will offend another; the underlying concern is the outrage or resentment caused by knowingly desecrating a public monument. The resulting damage or destruction is not at issue and does not figure in the punishment; rather, the focus is upon the actor's offensive conduct.

■ These two statutes are contained in different legislative acts, address differing situations, require different elements of proof, and serve different objectives. We believe the legislature intended to define two separate offenses with different elements and different levels of punishment. It follows that section 42.09 is not a special subset of the general offense of criminal mischief. Because the forbidden conduct is different, we hold the statutes are not *in pari materia. See Cheney,* 755 S.W.2d at 126 ("[*Pari materia* ] is not applicable to enactments that cover different situations and that were apparently not intended to be considered together"); *Alejos v. State,* 555 S.W.2d 444, 450–51 (Tex.Crim.App. 1977) (statutes treating same subject are not *in pari materia* where subject treated arises in different acts having different objects, and statutes not apparently intended to be considered together).

Where statutes are not *in pari materia, Cheney* directs us to determine whether the statutes may be harmonized or are in irreconcilable conflict. We detect no disharmony or conflict between these two provisions; one statute addresses property crimes, the other addresses disorderly conduct. The fact that both statutes can conceivably cover the same person and the same property does not call for *in pari materia* construction of the provisions when each serves a markedly different objective. *Cheney,* 755 S.W.2d at 129. The State could have elected to prosecute appellant under either of these provisions if it could prove the elements comprising each offense. Neither the State's election to prosecute under section 28.03 nor the trial court's subsequent exercise of jurisdiction was error. We overrule appellant's first point.

## WARRANTLESS SEARCH

In his second point of error, appellant challenges the introduction of evidence taken pursuant to a warrantless search of his truck. In his brief, appellant raises both state and federal constitutional grounds in the same point of error. The court of criminal appeals has addressed the possible dire consequences of failing to distinguish state and federal constitutional issues:

 Attorneys, when briefing constitutional questions, should carefully separate federal and state issues into separate grounds and provide substantial analysis or argument on each separate ground. If sufficient distinctions between state and federal constitutional ground is not provided by counsel, this court may overrule the grounds as multifarious.

*McCambridge v. State,* 712 S.W.2d 499, 502 n. 9 (Tex.Crim.App.1986). None-

theless, we will exercise our discretion to review each issue.

Appellant claims this search violated both the federal and state constitutions. *See* U.S. Const. amend. IV; Tex.Const. art. I, § 9. After reviewing the details and the object of this warrantless search, we disagree.

On June 29, 1989, officers of the Austin Police Department arrested the appellant in a parking lot and impounded his truck. The police did not conduct an inventory search, but instead procured a search warrant and removed evidentiary items from the vehicle. More than a month later, the police removed dirt particles from the open bed of the pickup truck, which still remained in police custody. Eleven soil samples taken from the truck contained hexazinone, the chemical found to have poisoned the Treaty Oak in June 1989.

1) *Federal Prohibition Against Unreasonable Search and Seizure*

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. In *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the Supreme Court noted that the primary object of the Fourth Amendment is the protection of privacy, not the protection of property. *Id.* at 302–06, 87 S.Ct. at 1647–50. Later, in *Illinois v. Andreas*, 463 U.S. 765, 767, 103 S.Ct. 3319, 3321, 77 L.Ed.2d 1003 (1983), the Court observed that "[i]f the inspection by the police does not intrude upon a legitimate expectation of privacy, there is no 'search' subject to the Warrant Clause." The Court has also held that a "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). We begin our analysis by asking if appellant had a reasonable expectation of privacy in the dirt found in the bed of his truck.

a) Privacy Interest in Dirt

 Appellant must first persuade us that the dirt removed from the bed of his truck is covered by the Fourth Amendment's protection of personal "effects." *See Cardwell v. Lewis*, 417 U.S. 583, 591, 94 S.Ct. 2464, 2470, 41 L.Ed.2d 325 (1974) (Fourth Amendment has traditionally been deemed to protect "personal effects"). If personal effects encompass dirt particles, we next ask if appellant demonstrated any efforts to preserve the dirt as private. If so, we must determine if his subjective expectation of privacy is one that society is prepared to recognize as reasonable or justifiable under the circumstances. *See Katz v. United States*, 389 U.S. 347, 349–50, 88 S.Ct. 507, 510–11, 19 L.Ed.2d 576 (1967) (instructing us to propound the final two questions to determine a legitimate expectation of privacy).

*Cardwell* involved the warrantless seizure of an automobile from a public parking lot after its owner's arrest for murder. Police compared casts made of tire tracks at the scene of the murder and foreign paint samples found on the victim's car with tire treads observed and paint scrapings taken from the defendant's car. The Court determined that "no personal effects, which the Fourth Amendment traditionally has been deemed to protect, were searched or seized and introduced in evidence." *Id.* at 591, 94 S.Ct. at 2470. The paint scrapings taken from the car were not personal effects; we find even less reason to consider dirt particles to be personal effects.

A New Jersey court relied on *Cardwell* to find "no suggestion that dirt, debris and the like on the floor or surface of a car would be attended by an expectation of privacy or would implicate a car owner's proprietary or possessory interests." *State v. Reldan*, 100 N.J. 187, 495 A.2d 76, 82 (1985). In *Reldan*, the defendant objected to evidence obtained by vacuuming the floor of his car; the dirt and debris contained evidence of drug use. The New Jersey Supreme Court found the vacuuming did not constitute a search because the dirt and debris could not be considered personal effects protected by the Fourth Amendment. "Moreover, none of the materials seized and subjected to microscopic

examination could reasonably have been considered the personal effects or private property of the defendant. They were common detritus—samples of dirt, debris, hair, and the like." *Id.* 495 A.2d at 83.

■■■ We rely on *Reldan* and *Cardwell* to hold that samples of dirt are not effects within the meaning of the Fourth Amendment. *Jacobsen* defines constitutionally protected effects as those "in which the public at large has a legitimate expectation of privacy." *Jacobsen,* 466 U.S. at 114, 104 S.Ct. at 1657. We conclude the public has no legitimate expectation of privacy in dirt. The dirt removed from appellant's truck did not serve to reveal matters of a personal nature relating to appellant's privacy. "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities." *Id.* at 122, 104 S.Ct. at 1661; *see also Andreas,* 463 U.S. at 771, 103 S.Ct. at 3324; *United States v. Knotts,* 460 U.S. 276, 280–81, 103 S.Ct. 1081, 1084–85, 75 L.Ed.2d 55 (1983); *Smith v. Maryland,* 442 U.S. 735, 739–41, 99 S.Ct. 2577, 2579–81, 61 L.Ed.2d 220 (1979); *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968).

Our opinion that the removal of dirt samples from appellant's truck bed did not constitute an impermissible search is bolstered by the lack of any evidence of appellant's subjective expectation of privacy. Appellant made no attempt to conceal the dirt by placing it in a closed container; rather, it was exposed to public view in the open bed of his truck. "[T]he manner in which a person has attempted to shield an item's existence and identity from public scrutiny will usually be the key to determining whether a reasonable expectation of privacy has been violated." *Jacobsen,* 466 U.S. at 142, 104 S.Ct. at 1671 (Brennan, J. dissenting). "What a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection.... But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz,* 389 U.S. at 351–52, 88 S.Ct. at 511.

Appellant had no privacy interest in the dirt both because it is not an effect and because he made no attempt to keep it private: "Lowered privacy expectations, however, may nevertheless justify a search of areas and things with respect to which a person would not ordinarily have any personal possessory or proprietary interest." *Reldan,* 495 A.2d at 82. We hold that the warrantless removal of dirt samples from appellant's truck bed did not violate the privacy interests protected by the Fourth Amendment.

(b) Subsequent Testing an Unreasonable Search?

■■■ The appellant further argues that the subsequent testing of the dirt was itself an unreasonable search. We disagree because none of the dirt seized and subjected to examination could reasonably have been considered his personal effects or private property. Though it is not controlling, we are persuaded again by the reasoning of *Reldan,* that "[i]f subsequent testing of items lawfully seized does not serve to reveal matters of a personal nature relating to an individual's privacy, it will not be deemed an unreasonable search." *Reldan,* 495 A.2d at 83. Here, as in *Reldan,* the testing of the dirt samples seized from the bed of the truck did not independently expose appellant's personal affairs or private life. "Consequently, because the microscopic analysis of this material could not serve to reveal any matters of an especially personal nature, it cannot be considered a search that trenches upon protectable privacy interests." *Id.*

The significance of the testing in this case may be contrasted with that in *State v. von Bulow,* 475 A.2d 995 (R.I.1984). There the subsequent governmental testing of pharmaceuticals represented "a significant expansion of the private search because it positively identified the unknown composition of the pills." *Id.* at 1018. The testing served to reveal the identity of the pills, a matter of individual privacy. *See Reldan,* 495 A.2d at 84.

In the present case, appellant has demonstrated no expectation of privacy in the soil that was tested. Moreover, the subsequent testing of the dirt did not serve to reveal any matter of individual personal privacy. We hold that the testing itself did not therefore constitute an impermissible search under the Fourth Amendment.

### 2) *State Prohibition Against Unreasonable Search and Seizure*

██ Article 1, section 9 of the Texas Constitution provides that "The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches." Tex.Const. art. I, § 9. The court of criminal appeals has recognized that this protection is similar in all respects to the protection offered by the Fourth Amendment. *See Heitman v. State,* 815 S.W.2d 681, 683 (Tex.Crim.App. 1991). Previously, we have looked to federal constitutional law to determine which searches and seizures offend our state constitution. Texas courts have held that the Texas safeguard against arbitrary invasion by the government is not more restrictive than the Fourth Amendment of the United States Constitution, *Garcia v. State,* 676 S.W.2d 202 (Tex.App.1984, pet. ref'd), and does not offer any greater protection than the United States Constitution. *Salazar v. State,* 806 S.W.2d 291 (Tex.App.1991, no pet.).

We are aware that the court of criminal appeals has recently commented upon the State's right, under federalism principles, to provide constitutional protections to its citizens in addition to those afforded under the federal constitution. *See Heitman,* 815 S.W.2d at 690. Clearly, the federal constitution represents the floor for individual rights, while the State constitution may establish the ceiling. *Id.* Recognizing this principle, we nevertheless have found no Texas opinions before or since *Heitman* that would grant to this appellant any broader state protection against the seizure and testing of the dirt in the bed of his pickup than he would be afforded under the Fourth Amendment. We conclude that dirt is not a "possession" afforded protection under the Texas constitution. We overrule the second point of error.

### 3) *Harmless Error*

██ Even if appellant had a privacy interest in the dirt that we have failed to discern, we believe the tainted soil samples would be cumulative of other evidence connecting appellant with hexazinone, the poison found in the ailing Treaty Oak. In determining whether error is harmless, *see* Tex.R.App.P. 81(b)(2) (Pamph.1992), we are not to focus on the propriety of the outcome of the case, but instead should be concerned with the integrity of the process leading to the conviction. *Harris v. State,* 790 S.W.2d 568, 587 (Tex.Crim.App.1989). Factors the Court should consider include: (1) the source of the error; (2) the nature of the error; (3) whether or to what extent it was emphasized by the State; (4) the error's probable collateral implications; (5) how much weight a juror would probably place on the error; and (6) whether declaring the error harmless would encourage the State to repeat it with impunity. *Harris,* 790 S.W.2d at 587.

██ Procedurally, we must first isolate the error and all its effects, using the considerations set out above and any other considerations suggested by the facts of the cause. Second, we must ask whether a rational trier of fact might have reached a different result if the error and its effects had not occurred. *Id.* at 587–88. We do not focus primarily on the weight of the other evidence of appellant's guilt, but instead focus on whether the error might possibly have prejudiced the jurors' decision-making. In other words, our responsibility is to determine whether the trial was an essentially fair one. *Id.*

At trial, the State introduced into evidence tape recordings it had made of conversations between the appellant and State's witness Cindy Blanco. In those recordings, the appellant discussed his acts that led to the destruction of the Treaty Oak. In addition, Blanco testified that during her daily rides with appellant to a methadone clinic, he began to drive around looking for a "special" oak tree. The wit-

ness related that during this period of time she saw some containers labeled "Velpar" (Velpar is a commercial brand name for hexazinone) in the back of appellant's truck. During one instance, the witness remarked to the appellant that she would "like to shake the hand of the dumb, stupid guy that did this to the tree," whereupon the appellant "put out his hand and said 'meet the dumb, stupid guy that did that to the tree.'" The witness further testified that the appellant told her he was deliberately killing the tree and was doing so in revenge for the State's having made him work at planting and tending to trees and for other reasons relating to his frustrated romantic aspirations toward his methadone counselor.

Applying the harmless-error standard and recognizing that cumulative evidence can be a factor to be considered, we conclude beyond a reasonable doubt that the introduction of the evidence of the dirt obtained from the appellant's truck and its subsequent testing did not contribute to the appellant's conviction or punishment. It was merely cumulative of other evidence already admitted during trial. In light of this circumstance, we think that error, if any, surrounding the seizure and analysis of the dirt samples would have, beyond a doubt, made no contribution to appellant's conviction or punishment. See Tex. R.App.P. 81(b)(2) (Pamph.1992).

## EVIDENCE TREE WAS "DESTROYED"

■ In his third and final point of error, appellant claims that his conviction rests upon a theory unsupported by the evidence. His claim centers around the meaning of the word "destroyed" as used in the jury charge:

> [I]f you believe ... that ... Paul Stedman Cullen ... did then and there intentionally or knowingly damage or *destroy*

tangible property ... you will find the defendant guilty of the offense....

(Emphasis added). Appellant argues that because he was indicted for damaging and *destroying* the Treaty Oak, the State must prove that he did, in fact, destroy the tree. Because the evidence shows that at least one-third of the tree survived his chemical attack, appellant argues that the tree has only been damaged, not destroyed, and thus his conviction is not supported by the evidence. We disagree.

■ The criminal mischief statute is worded disjunctively to allow for prosecution if a person "damages *or* destroys tangible property...." *See* § 28.03(a)(1) (emphasis added). The charge submitted to the jury was worded disjunctively, even though the indictment was worded conjunctively. A conjunctive pleading will support a disjunctive submission to the jury. *Zanghetti v. State*, 618 S.W.2d 383, 387–88 (Tex.Crim.App.1981); *Knorpp v. State*, 645 S.W.2d 892, 904 (Tex.App.1983, no pet.). Thus the State was required to show that appellant either damaged or destroyed tangible property. However, we believe the evidence supports appellant's conviction for destroying as well as damaging the tree.

■ The appellant, the State, and the trial court all agreed that "destroy" is not statutorily defined. It follows that the term's meaning should be determined by its common usage. *See* Tex.Gov't Code Ann. § 311.011 (1988). Appellant and the State have provided us with dictionary definitions of the word "destroy." We have consulted our own dictionaries as well.[2]

After reviewing all of these definitions, we believe that a jury could find that the Treaty Oak had been "destroyed," notwithstanding the fact that, at the time of trial, one-third of the tree contained less than toxic amounts of the chemical herbicide. We conclude that "destroy" could refer to

---

**2.** Our own dictionaries define the term as follows:

"Destroy: 1. to reduce (an object) to useless fragments, a useless form, or remains, as by rending, burning, or dissolving; injure beyond repair or renewal."

The Random House Dictionary of the English Language 540 (2d. ed. 1987). Consider also the following definition:

"Destroy: to ruin completely; spoil so that restoration is impossible."

The American Heritage Dictionary of the English Language 358 (1973).

total or partial destruction. The record contains testimony that, at the time of trial, the destruction to the Treaty Oak's canopy exceeded fifty percent and that this destruction was increasing. There was expert testimony that a tree that has lost more than fifty-percent of its canopy may be considered a total loss.[3]

█ When reviewing the sufficiency of the evidence supporting a conviction, the court must view all of the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Butler v. State,* 769 S.W.2d 234, 239 (Tex.Cr.App.1989). We believe the evidence in the record supports the jury's determination that appellant's chemical attack on Treaty Oak destroyed the tree. We overrule appellant's third point of error.

## CONCLUSION

Finding no error, we affirm the conviction.

---

3. Expert testimony revealed that a tree's canopy (or crown) constitutes the "food-making" portion of the tree itself. If the canopy is reduced, the tree makes less food for itself. This in turn has the effect of continuously impeding the tree's growth, and eventually causing the tree to starve to death.