In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00162-CR


______________________________




JAMES CLYDE LACKEY, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the Fourth Judicial District Court


 Rusk County, Texas


Trial Court No. CR07-301




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



 After a bizarre, extended confrontation initiated and fueled by Kasey Lackey, the wife of
James Clyde Lackey (Lackey), Lackey was seen apparently tossing something onto a road. Shortly
thereafter, numerous tires were punctured by a number of roofing nails in the roadway. Lackey
appeals from a jury conviction (1) for criminal mischief with damages in excess of $1,500.00. 

 Lackey contends that the evidence is legally and factually insufficient to support both his
identification as the perpetrator of the offense and the amount of damages; Lackey also complains
that the State failed to preserve evidence and to fully investigate the case, resulting in a denial of
Lackey's  right  to  a  fair  trial.  We modify the judgment of the trial court to reduce the grade of
offense to a class B misdemeanor, and remand this cause for a new punishment trial, based on four
holdings: (1) legally and factually sufficient evidence supports the identification of Lackey as the
perpetrator of the offense, (2) there has been no showing that any failure to preserve evidence
harmed Lackey, (3) there has been no showing that the State failed to adequately investigate the
offense, and (4) legally and factually sufficient evidence supports a finding only that the pecuniary
loss from the offense exceeded $50.00 but was less than $500.00.

(1) Legally and Factually Sufficient Evidence Supports the Identification of Lackey as the
Perpetrator of the Offense


 In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light
most favorable to the verdict and determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. Johnson v. State, 23 S.W.3d 1, 7 (Tex.
Crim. App. 2000).

 In a factual sufficiency review, we review all the evidence, but do so in a neutral light and
determine whether the evidence supporting the verdict is so weak or is so outweighed by the great
weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly
unjust. Lancon v. State, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); Roberts v. State, 220 S.W.3d
521, 524 (Tex. Crim. App. 2007); Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006);
Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); Clewis v. State, 922 S.W.2d 126,
134 (Tex. Crim. App. 1996).

 A pickup truck appeared at the rural Rusk County home of Seth and Sandra Russell around
8:00 to 8:30 p.m. In the truck were Lackey, Kasey, and a third person who was driving. Kasey
knocked on the Russells' door and announced that she was looking for her sister Kara, long a friend
of the Russells' son, Seth Jr. Kasey was agitated at this time, being described as hysterical, and
claimed that Kara and Seth Jr. were on the Russells' land at a pasture party and that Kara had asked
Kasey to meet her there.

 Sandra testified that Kasey got more and more hysterical as she talked; eventually, Sandra
awakened her husband Seth to take Kasey out to the pasture and demonstrate to her that no one was
out there. The Russells led the Lackeys down a country road, and took them into the pasture. No
one was found out there, partying or otherwise.

 Sandra's testimony indicates, however, that this did not defuse Kasey. By that point, Kasey
was furious, cursing and yelling at Sandra and Seth. Kasey went "on and on about, you know, just
because we owned all this land, we thought we were better than everybody else; you know, she was
going to whip my ass; you know, I didn't know who I was messing with." Although Kasey remained
in the middle of the pickup seat, Lackey, who was riding on the passenger side, stepped out of his
(right side) door, as Seth stepped out of his own truck. As described by Sandra's testimony, Lackey,
"screaming and yelling," got a piece of pipe out of the pickup's bed. Seth picked up a ball-peen
hammer or hatchet--the evidence is conflicting--and the two men headed toward each other. 
During the midst of this, Sandra called the county sheriff's department and asked for assistance. A
violent confrontation was narrowly averted.

 Thereafter, these things happened: Seth told the Lackeys to get off his property, Sandra
talked her husband back into their truck, Lackey got back in the passenger side of his truck, and that
vehicle started in a direction leading off the Russell property. In Sandra's narrative, the truck stopped
often on that short trip. The Russells quite prudently opted to stay well behind the Lackey vehicle,
and eventually the Lackeys turned back onto a county road.

 Sandra testified that she then saw a man get out of the passenger side of the truck on that
county road and make what she described as throwing motions. The Lackeys then drove away but
stopped again at the Russells' house, where the man on the passenger side went around the truck and
made what Sandra described as backhanded throwing motions like he was tossing corn to chickens. 
After that, the man got back into the truck, and it finally disappeared. Sandra identified Lackey as
the man who had exited the truck (and tossed whatever had been tossed onto the road). She noted
that the truck's driver was a good deal larger than Lackey and that there were huge spotlights at a
nearby saltwater pump station that lit up the intersection. 

 When the Russells pulled their truck out onto the road, it ran over a large number of roofing
nails which perforated its tires. Police arrived shortly thereafter, and also drove over the nails,
flattening three or four tires on each of three squad cars. In addition, the Russells' mailbox, which
was located approximately where Lackey stopped the second time, was smashed flat. 

 Seth's testimony was essentially the same as his wife's. 

 Lackey contends that this evidence is insufficient to show that he was responsible for the
scattering of the nails because there is evidence of another actor: Kara, the "missing" sister, testified
that a cousin from out of town had bragged to her that he was driving the pickup and had thrown out
the nails. Despite multiple pretrial efforts by officers to obtain a name, the cousin was identified for
the first time at trial as Jason Bentle, a cousin who seldom visited and lived in Dallas. Kara also
testified that they were at a beer-drinking pasture party at the Russells' pasture, but, after waiting an
hour and a half or so for her sister to appear, had left before the sister arrived. Kara also testified that
it was around 11:30 or 12:00 when she called her sister and that, when they left, they left a bonfire
burning. 

 On cross-examining Kara, the State pointed out that, although she said she had called her
sister at near midnight, and then that she left an hour and a half after that, police had come to the
location by nine or ten o'clock that night, and that everything was over by one in the morning. The
State also pointed out that this story first saw daylight at her brother-in-law's trial. Lackey then
elicited testimony that she had told him about it two weeks previously. 

 An aunt, Kathy Odom, testified similarly about Bentle, and stated that she had not been
questioned by any investigators and had not volunteered any information to police.

 Kasey's grandmother, Shirley Odom, testified that Odom had told Deputy Charles Helton the
name of Bentle when the officer came to her home shortly after the incident. She also testified that
Bentle had not admitted that he actually threw the roofing nails. 

 Crystal Runnels, an assistant manager at the local Goodyear dealership, testified about the
value of damaged tires as used material. She testified that she would pay roughly between twenty
and thirty-five dollars per tire for used tires with about half the tread left. She also testified that they
sold tires to the local police department and that they disposed of the ones removed from police
cruisers by reselling them if possible, or just disposing of them if not. She also noted that she
typically paid nothing for used police tires; they were simply removed when new ones were installed. 
She also testified that tires with multiple punctures--like the fifteen to twenty punctures shown on
several photographs of tires damaged during this incident--could not safely be repaired, especially
on a police cruiser that might run at high speeds. 

 Kasey also testified. She testified that, after getting off work at Sonic, she went to the
Russells' home around 9:30 p.m. after receiving a call from Kara. (2) Kasey testified that Sandra was
rude to her; that she did not understand why Sandra suddenly had developed a problem, because the
Russells usually partied with the kids; and that both Russells smelled like liquor and could not stand
up straight. Her version of the story was that Lackey emerged from the truck because the Russells
were screaming at Kasey. Kasey testified that they accused her of bringing alcohol to the pasture
parties. She stated that the Lackeys had driven by the pasture first and saw no party, but had gone
to question the Russells anyway. According to Kasey's version of events, the Russells insisted that
they accompany the Lackeys to the pasture to see that no party was taking place.

 Kasey testified that Seth got violent, swinging a hammer (with an axe blade) around and
close to her husband (who was still in the pickup). She testified that they did not stop on the way
out of the pasture, but only at the stop sign. She noted that the driver, Bentle, got out and, she
thought, urinated. Then they drove off, meeting her sister on the same road a few minutes later. (3) 
Kasey testified that she knew nothing about any roofing nails until Bentle told her about it later that
evening. Kasey testified that it was at least three months before an officer, Helton, came by their
house to question them about that night, but that she did not tell Helton about Bentle's "admission"
about the nails. She also testified that, because the officer cursed at her, she did not volunteer
Bentle's "admission." 

 Helton testified from his notes that his visit to the house was five days after the events in
question. He testified that Kasey did not tell him about Bentle's "admission" about the nails, and did
not identify him in any respect. 

 Kathy Odom also testified that Bentle bragged about putting the nails out. 

 Lackey testified in his own defense, with a story matching his wife's in most respects. The
points of differentiation are in the length of time that elapsed before officers came to their house to
talk to them--he testified it was only a few days, rather than three months--and the officer's
behavior while there--the officer, although sounding like a "broken record," was quite cordial and
pleasant.

 Sandra was recalled and testified that she was certainly not drunk that night. In fact, she
testified that she was allergic to alcohol and had not had a drink since she was in her early twenties. 

 Deputy Russell was also recalled and testified that he was dispatched to the Russell property
at 9:00 p.m., arriving about fifteen to twenty minutes later, that neither of the Russells had any smell
of alcohol on them and that they showed no symptoms of intoxication. 

 Seth was also recalled, and testified that he had drunk something alcoholic that afternoon,
but was in bed asleep when the Lackeys arrived because he had to go to work around four or five in
the morning. He testified that he never condoned children drinking in his pasture, that he had once
broken up such a party and poured out all their beer, that he was worried about liability, and that he
had picked up a ball-peen hammer, not a hatchet, during the confrontation. 

 There is conflicting evidence about the sequence and nature of events that occurred on that
night. There is evidence from which a jury could find that Lackey was the individual responsible
for scattering nails all over the roadbed, and there is evidence to the contrary. In such a situation,
the jury's determination controls. As the evidence is not so unbelievable as to require a different
result, we find that the evidence is both legally and factually sufficient to support the jury's
assessment of guilt.

(2) There Has Been No Showing that Any Failure to Preserve Evidence Harmed Lackey

 Lackey also argues briefly, and without resort to relevant authority, that the State engaged
in spoliation by disposing of the tires before they could be examined by a representative of Lackey
to determine if they were truly destroyed or were repairable. Although this argument is linked to the
damage argument, it does not appear that this argument was ever brought to the trial court's attention. 
Thus, it has not been preserved for our review. See Tex. R. App. P. 33.1.

(3) There Has Been No Showing that the State Failed to Adequately Investigate the Offense

 Lackey also argues briefly that the State did not adequately investigate the offense: if the
State had done its job properly, it would be prosecuting "Jacob Bentle," rather than Lackey (and
eventually his wife, who has evidently also been indicted for this crime).

 It is the duty of every peace officer to: (1) use all lawful means to preserve the peace within
his or her jurisdiction; (2) prevent or suppress crime; (3) execute all lawful process issued to him
or her by any magistrate or court; (4) give notice to some magistrate of all offenses committed within
his or her jurisdiction, where he or she has good reason to believe there has been a violation of the
penal law; and (5) arrest offenders without warrant in every case where he or she is authorized by
law. Tex. Code Crim. Proc. Ann. art. 2.13 (Vernon 2005); Dominguez v. State, 924 S.W.2d 950,
953 (Tex. App.--El Paso 1996, no pet.). (4)

 We also recognize the duty imposed by the Legislature as follows: "the primary duty of all
prosecuting attorneys . . . not to convict, but to see that justice is done." Tex. Code Crim. Proc.
Ann. art. 2.01 (Vernon 2005). This does not, however, translate into an affirmative duty on either
prosecutors or investigators to eliminate all possible miscreants when their investigation identifies
a possibly guilty party.

 Lackey supports this argument by stating that the investigator, Helton, closed his
investigation after, while attempting to interview Kasey, he lost his temper and cursed at her. There
is evidence from Kasey to that effect, and also testimony from Helton that Kasey had lost her temper
and cursed at him, with her husband, James, attempting to calm her down. Thus, even the testimony
itself is in conflict, and it is apparent that an investigation was conducted, which ultimately resulted
in a conviction supported by sufficient evidence. Under such facts, we do not agree with Lackey's
position that any right to an adequate investigation was violated. (5)

(4) Legally and Factually Sufficient Evidence Supports a Finding Only That the Pecuniary Loss
from the Offense Exceeded $50.00, but Was Less than $500.00

 Lackey argues that the evidence is insufficient to prove that "damages" exceed $1,500.00. 
We point out that "damages," as was argued at trial and on appeal, is not the issue here; the statutory
measure is the "amount of pecuniary loss" as defined by Section 28.06 of the Texas Penal Code. 
That being said, we agree in part with Lackey.

 A person commits the offense of criminal mischief if he or she damages or destroys another
person's tangible property without that person's consent. Tex. Penal Code Ann. § 28.03(a)(1)
(Vernon Supp. 2008). The disjunctive wording of the statute allows for prosecution if a person
"damages or destroys tangible property. . . ." Id.; Adams v. State, 222 S.W.3d 37, 47-48 (Tex.
App.--Austin 2005, pet. ref'd); Cullen v. State, 832 S.W.2d 788, 796 (Tex. App.--Austin 1992, pet.
ref'd); Athey v. State, 697 S.W.2d 818, 821 (Tex. App.--Dallas 1985, no pet.). The grade of the
offense is set by the amount of the pecuniary loss resulting from the criminal mischief. Tex. Penal
Code Ann. § 28.03(b).

 The "value of pecuniary loss" is a crucial element of the offense because it forms the basis
of the punishment assessed. Elomary v. State, 796 S.W.2d 191, 192-93 (Tex. Crim. App. 1990);
Jones v. State, 377 S.W.2d 205, 206 (Tex. Crim. App. 1964); Barnes v. State, 248 S.W.3d 217, 220
(Tex. App.--Houston [1st Dist.] 2007, no pet.). The amount of pecuniary loss is determined
depending mainly on whether the criminal mischief damaged or destroyed the property.

 If the property is destroyed, the pecuniary loss is the fair market value of the property when
and where it was destroyed. Tex. Penal Code Ann. § 28.06(a)(1) (Vernon 2003). On the other
hand, if the property is destroyed but the fair market value of that property cannot be ascertained,
then the pecuniary loss is the cost of replacing that property. Tex. Penal Code Ann. § 28.06(a)(2). 
Finally, if the property is not destroyed, but is merely damaged, the pecuniary loss is the cost of
repairing or restoring the property. Tex. Penal Code Ann. § 28.06(b).

 A number of years ago, the "Treaty Oak" was poisoned and at the time of trial had sustained
terrible, but not yet fatal, damage. The perpetrator of that offense was convicted. The appeal
addressed the sometimes difficult boundary between destruction and damage. Even though the tree
was still clinging to life at the time of trial, the appellate court held that the evidence was sufficient
to establish destruction of the tree within the meaning of the statutory scheme. That ruling was based
on dictionary definitions of "destroy," as well as opinion evidence suggesting that the tree could be
considered a total loss. See Cullen, 832 S.W.2d at 796-97. Because there is evidence in this case
of initial efforts to patch the tires, and also ultimate replacement of all damaged tires over some lapse
of time and differing circumstances, we conclude the jury could have made justifiable findings of
either damage or destruction of the tires. Fortunately, to appropriately decide this case, we need not
determine definitively whether the tires involved here were destroyed or damaged within the
meaning of the statutory scheme.

 Lackey argues that the evidence is insufficient because the State used only replacement value
as proof of loss without first demonstrating that the fair market value of the property at the time of
the damage could not be ascertained. See Deas v. State, 752 S.W.2d 573, 575 (Tex. Crim. App.
1988). We find no evidence that the fair market value of the tires damaged or destroyed cannot be
ascertained; without such evidence, the evidence of replacement cost is ineffectual.

 Assuming that the tires were merely damaged, the State was to prove "pecuniary loss" by
proving the cost of repairing or restoring the tires. Tex. Penal Code Ann. § 28.06(b). There was
no evidence of the cost of repairing or restoring the tires from the patrol vehicles. The evidence as
to Russell's truck was that he initially spent $75.00-80.00 to patch the six tires on the truck. That
is evidence of pecuniary loss of as much as $80.00.

 If, however, the tires--those on the patrol vehicles or on Russell's truck--were destroyed
within the meaning of the statutory scheme, the State was to prove "pecuniary loss" by proving the
fair market value of the tires destroyed. The State primarily focused on producing evidence of the
cost of the replacement tires but did provide some evidence of the value of used tires.

 Crystal Runnels, an assistant manager of the local Goodyear dealer, testified that used tires
with about half of the tread remaining would be worth a minimum of $20.00 to her, and that she paid
up to $39.00 for used tires with more tread left on them. The differential also existed between
seventeen and eighteen inch tires--with seventeen inch tires being worth $20.00 each, and eighteen
inch tires being worth perhaps $35.00 each. She also testified that used light truck tires went for
about $25.00. Her testimony is in the context of purchasing the tires as trade-ins for new ones. She
also noted that, when police car tires came in, they were typically unsaleable because they were worn
out and that tires requiring the number of patches described in this case were not safe. 

 Officer Bathke had testified that some of each size were damaged, though without specificity
as to how many of each type. Three cars were involved, and one of the cars had tires of a size
different from the other two cars. 

 From this evidence, imprecise as it is, we can at least set the maximum pecuniary loss that
has been proven with the evidence in this record. The police lost ten tires as a result of Lackey's
behavior. At least four were eighteen inch tires, and there is testimony that used tires could be worth
about $35.00 each as trade-ins for new ones. Although they likely would have resold to customers
for more than that, there is no evidence as to for how much. The six remaining tires could have
brought $20.00 each as trade-ins. Arguably, that is evidence of a maximum value of $260.00 for the
patrol tires lost. We also note that the truck-tire evidence--six tires at $25.00 each--could support
a maximum value of $150.00. There is also evidence of repair work totaling $80.00 on Russell's
tires before they were replaced. Thus, we have some evidence--if competent to prove fair market
value--of the maximum value of the lost police tires and the maximum value of Russell's lost tires. 
We also have evidence of the cost to initially repair Russell's tires. Without ruling on the actual
efficacy of the above evidence, we hold that the maximum total pecuniary loss as authorized by the
statute and found by the jury from this record was $490.00.

 That, with the other necessary findings of the jury, supports a conviction of criminal mischief
as a class B misdemeanor, but no more. See Tex. Penal Code Ann. § 28.03(b)(2).

 A court of appeals may reform a judgment of conviction to reflect conviction of a lesser-
included offense if (1) the court finds that the evidence is legally insufficient to support conviction
of  the  charged  offense,  but  sufficient  to  support  conviction  of  the  lesser-included  offense  and
(2) either the jury was instructed on the lesser-included offense or one of the parties asked for, but
was denied, such an instruction. Herrin v. State, 125 S.W.3d 436, 443-45 (Tex. Crim. App. 2002);
Garrett v. State, 161 S.W.3d 664, 672 (Tex. App.--Fort Worth 2005, pet. ref'd).

 This charge contains instructions on a series of lesser-included offenses of criminal mischief,
including one with a pecuniary loss in the range for a class B misdemeanor, $50.00 to $500.00. The
evidence is sufficient to support a conviction for criminal mischief in the amount of $50.00 but less
than $500.00. Accordingly, we reform Lackey's judgment of conviction to reflect that the offense
of which he was convicted is a class B misdemeanor, and remand this case to the trial court for a new
punishment hearing. See Herrin, 125 S.W.3d at 443-45; Garrett, 161 S.W.3d at 672 .


 Josh R. Morriss, III 

 Chief Justice


Date Submitted: July 1, 2009

Date Decided: July 2, 2009


Publish
1. Lackey's punishment was assessed by the trial court at two years' confinement, which was
probated for a term of five years, and restitution was ordered in the amount of $2,107.00.
2. She testified that they rode with Jason because his truck worked, and theirs had not run for
two years. 
3. Kasey testified that his action was unsurprising, as he drank beer one after another all day
long, one forty-ounce bottle or can after another. She then backed up and testified that he was not
drinking while they were going to check on her sister.
4. Similarly, a police officer must exercise discretion in determining how to investigate, and
to what extent to investigate before seeking a warrant. See City of Hempstead v. Kmiec, 902 S.W.2d
118, 121 (Tex. App.--Houston [1st Dist.] 1995, no pet.). 
5. We also recognize that counsel has directed us to no authority or cases that involve a
situation such as this, and we have found nothing directly on point.