Tracy LUNA, Appellant,

v.

STATE of Texas, Appellee.

No. 11–07–00141–CR.

Court of Appeals of Texas, Eastland.

June 26, 2008.

Rehearing Overruled July 24, 2008.

Frank W. Conard II, Frank Conard Law Firm, Sweetwater, TX, for Appellant.

Dana Cooley, District Attorney, Scurry County, Snyder, TX, for Appellee.

Panel consists of WRIGHT, C.J., McCALL, J., and STRANGE, J.

**OPINION**

RICK STRANGE, Justice.

Tracy Luna was indicted for capital murder. The jury convicted her of the lesser included offense of causing serious bodily injury to a child and assessed her punishment at ninety-nine years confinement and a $10,000 fine. We affirm.

### I. *Background Facts*

Luna and Angel Victor Vasquez were common-law married. They had two daughters, four-year-old B.N.L.V. and two-year-old Natalie Vasquez. During the early morning hours of May 11, 2005, emergency officials were dispatched to Luna and Vasquez's house because of a

report that a two-year-old child was having cardiac arrest. Paramedics arrived and administered CPR to Natalie. She had no electrical activity in response to an EKG, and so she was taken to the hospital. Because Natalie had numerous bruises, paramedics requested that a law enforcement officer meet them at the emergency room. Natalie was pronounced dead at the hospital. The medical examiner's office conducted an autopsy and determined that Natalie died of complications of blunt force trauma and neglect.

Luna and Vasquez were indicted for capital murder. The State alleged that they knowingly and intentionally caused Natalie's death by failing to provide her with medical care or adequate food. The State was subsequently allowed to amend the indictments to include a contention that Luna and Vasquez had a duty to act because they were Natalie's parents. Luna and Vasquez were tried together. The jury acquitted them of capital murder but found them guilty of the lesser included offense of intentionally or knowingly causing serious bodily injury to a child. The jury assessed each defendant's punishment at ninety-nine years confinement and a $10,000 fine.

## II. *Issues on Appeal*

Luna challenges her conviction with six issues. Luna argues that the evidence was legally and factually insufficient, that the trial court erred by admitting autopsy photos, that the trial court erred by including a lesser included offense in the charge, that the trial court erred by admitting hearsay testimony, that the trial court erred by denying her motion to sever, and that the trial court erred by denying her motion to quash the indictment and by granting the State's motion to amend the indictment.

## III. *Analysis*

### A. *Was the Evidence Legally and Factually Sufficient?*

Luna argues that the evidence is insufficient because it does not establish that she was aware with reasonable certainty that Natalie's death could be prevented by taking her to the doctor. Luna argues that the evidence establishes that Natalie was in good health, that she was active, and that there was no indication immediately prior to her death that she needed medical attention. The State responds that the evidence is sufficient because Natalie died of malnutrition; because she had twenty-four scars, sixty-one bruises, and an open and infected ulcer that went to the underlying bone; and because Natalie's need for food and medical care was obvious.

#### 1. *Standard of Review.*

To determine if the evidence is legally sufficient, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Jackson v. State,* 17 S.W.3d 664, 667 (Tex. Crim.App.2000). The jury was the sole judge of the credibility of the witnesses and the weight to be given their testimony. TEX.CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979). The jury may choose to believe or disbelieve all or any part of any witness's testimony. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex. Crim.App.1986).

To determine if the evidence is factually sufficient, the appellate court reviews all of the evidence in a neutral light. *Watson v. State,* 204 S.W.3d 404, 414 (Tex.Crim.App. 2006). Then, the reviewing court determines whether the evidence supporting the verdict is so weak that the verdict is clear-

ly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Id.* at 414–15.

The appellate court reviews the factfinder's weighing of the evidence and cannot substitute its judgment for that of the factfinder. *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997); *Clewis v. State,* 922 S.W.2d 126, 133 (Tex.Crim.App.1996). Due deference must be given to the factfinder's determination, particularly concerning the weight and credibility of the evidence. *Johnson v. State,* 23 S.W.3d 1 (Tex.Crim.App.2000); *Jones v. State,* 944 S.W.2d 642 (Tex.Crim.App.1996).

■ A person commits an offense if she intentionally or knowingly causes injury to a child by act or by omission if he has a duty to act. TEX. PENAL CODE ANN. § 22.04 (Vernon Supp.2007). Parents have a duty to care for, to control, to protect, and to provide medical care to their children. TEX. FAM.CODE ANN. § 151.001(a)(2), (3) (Vernon Supp.2007). Injury to a child is a result of conduct offense. *Alvarado v. State,* 704 S.W.2d 36, 39 (Tex.Crim.App. 1985). Therefore, the State must prove not only that Luna failed to provide adequate food and medical care but must also prove that she intentionally or knowingly caused Natalie's injury. *Johnston v. State,* 150 S.W.3d 630, 634 (Tex.App.–Austin 2004, no pet.). A person acts intentionally when it is her conscious desire to engage in the conduct or to cause the result. TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003). A person acts knowingly with respect to a result of her conduct when she is aware that her conduct is reasonably certain to cause the result. TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003). Serious bodily injury is injury that creates a substantial

risk of death or that causes death, serious permanent disfigurement, or protracted loss of impairment of the function of any bodily member or organ. TEX. PENAL CODE ANN. § 1.07(a)(46) (Vernon Supp.2007).

### 2. Legal Sufficiency.[1]

■ Natalie was born on December 2, 2002, and was a normal size baby. Dr. Gustavo Gross saw her for a two-week checkup. She was doing well, had gained some weight since birth, and weighed 7.7 pounds. Dr. Gross did not see her again as a patient until January 14, 2004. Even though Natalie was thirteen months old, she only weighed 13.4 pounds. Natalie appeared dehydrated, malnourished, and hyperglycemic. Dr. Gross made arrangements for Natalie to be hospitalized and seen by a specialist in Lubbock.

Dr. James V. Higgins was responsible for her treatment in Lubbock. Dr. Higgins testified that when Natalie arrived there were questions about her liver function because of test results but that over two days her liver enzymes had dropped dramatically. Dr. Higgins testified that essentially all they did was feed Natalie. During the forty-eight hours she was hospitalized, Natalie took in more food than expected, and she achieved a significant weight gain, going from 5.8 to 6.4 kilos. This equates to a weight gain of approximately 1.3 pounds. Dr. Higgins described Natalie as a hungry child who wanted to eat.

Dr. Higgins saw Natalie two weeks after her hospital discharge for a follow-up visit. She looked good. Dr. Higgins recommended replacing Natalie's milk with PediaSure to provide more calories. He did not recommend withholding solid food, but

1. Luna challenges the admission of a counselor's testimony by separate issue. We are required to consider a legal sufficiency challenge before a challenge to the admission of evidence. To simplify our review, we are not considering the challenged evidence in our legal or factual sufficiency analysis.

Luna began telling relatives that Natalie could not handle solid food. Later, Natalie was only allowed to eat small amounts of solid food.

Dr. Gross also saw Natalie shortly after her discharge. He testified that he stressed to Luna the need to keep any follow-up appointments with the specialist and that he told her to take Natalie back to the doctor if she started to lose weight. Dr. Gross next saw Natalie on April 26, 2004. Natalie had the worst case of impetigo that he had ever seen. Dr. Gross testified that he was concerned. He treated Natalie with an ointment and an oral antibiotic. He saw her for follow-up visits on April 27 and April 28. The April 28 visit was the last time he saw Natalie as a patient. Dr. Gross testified that, if he had seen a child that looked like Natalie did when she arrived at the emergency room, he would have called the authorities. Dr. Gross testified that Luna and Vasquez should have been extremely concerned about Natalie's weight, that he would have expected them to recognize impetigo when it returned, and that he would have expected them to seek medical treatment for it. He also testified that they were neglectful for not doing so.

Dr. Thomas Lloyd Kerr saw Natalie when paramedics brought her body to the emergency room. He testified that, if the authorities had not already been alerted, her injuries would have required him to do so. She had multiple bruises on her face, abdomen, back, hips, left leg, and behind her left ear. These bruises were too well-defined to have been caused by a fall. Natalie had a decubitus ulcer on her sacrum that went through the epidermis to the bone. It was infected, and it would have been painful for her. When Dr. Gross saw Natalie in April 2004, she weighed twenty-two pounds. When Natalie died on May 11, 2005, her weight had dropped to seventeen pounds.

Justice of the Peace Debra Boyd was called to the hospital. She saw Natalie's body and testified that a parent should have known Natalie needed medical attention. Sheriff Darren Jackson was one of the law enforcement officers dispatched to the hospital, and he too saw Natalie's body. He testified that she looked six months old; that he would have realized she needed medical attention; and that, if he had seen Natalie in this condition, he would have taken custody of her and would have taken her to the emergency room. Sheriff Jackson contacted CPS and requested their assistance because he wanted to have Luna and Vasquez's oldest child removed from their home.

Judge Boyd authorized an autopsy. Dr. Sridhar Natarajan, Chief Medical Examiner for Lubbock County and the doctor responsible for Natalie's autopsy, testified that there were several indications that Natalie had not been fed properly. These included the loss of body fat, reduced thickness of muscle, fluid accumulating in the peritoneal cavity, and the brittleness of her hair. During the autopsy, doctors identified twenty-four well-healed scars, sixty-one bruises, two previously fractured ribs, and a staph infection in her blood. They found little to no fat on her chest wall and around her bowel. The medical examiner's office determined that the cause of death was complications from blunt force trauma and neglect.

Even Luna's expert Dr. Robert Lloyd White agreed that Natalie was malnourished, that she died from protein-calorie malnutrition, and that she had extensive bruises of a suspicious nature. He would have included battered baby syndrome as a contributing condition and homicide as the manner of death if he had done the autopsy. He believed that Natalie needed medical attention.

Relatives had noticed Natalie's bruises and weight loss. When they asked about Natalie's bruises, Luna always had an explanation, such as falls. When Natalie had marks on her face that appeared to be burns, Luna said that they were caused by chemicals on a watermelon that had not been properly washed. She lied to her brother about taking Natalie to the doctor. Luna's mother thought Natalie was sick because she was so small, and she told Luna to take Natalie to the doctor. Luna's father told her to let Natalie eat. Luna got mad at him for feeding Natalie, and on one occasion, Luna and Vasquez left his house because they thought he had given Natalie too much food.

Luna testified in her own defense. When Natalie first developed impetigo sores she took her to the doctor. The sores cleared up with medication. She treated the ulcer on Natalie's tailbone with a cream from Wal–Mart. Natalie started to pick at it, and Luna began using Neosporin and Benadryl. Luna understood the seriousness of impetigo. She knew what it was when it returned but decided not to take Natalie to the doctor. Luna was aware that Natalie had lost weight. She and Vasquez talked about it. Luna attributed Natalie's bruises to falling and playing. However, when shown the pictures from the emergency room, Luna testified that she had never seen several of the bruises visible on her body.

Kerrie Blair, a CPS investigator, went to Luna and Vasquez's residence. She asked to see the cream Luna told law enforcement officials she had been using to treat Natalie's ulcer. Luna told her that it had been thrown away and was unable to produce any medication. Luna claimed that she had also been using Neosporin to treat Natalie's ulcer but told Blair that they had been out of it for a couple of days. Luna agreed that she did not have any of the cream she had previously re-

ceived from Dr. Gross but claimed that Blair was lying when she said that there was no Neosporin in the house.

Blair testified that PediaSure was available free of charge from the WIC program. She testified that she learned during her investigation that Luna had gotten into a disagreement with the WIC nurse and that she stopped going to the WIC office. Blair testified that she learned Natalie was not allowed to get food when she wanted and that, if she attempted to do so, she was punished. Luna and Vasquez's two dogs, however, appeared well-fed.

The evidence is legally sufficient. Luna argues that there was no evidence that she was aware with reasonable certainty that Natalie's death would have been prevented by taking her to the doctor. This is not the specific question we must address because Luna was not convicted of capital murder. The question is whether Luna intentionally or knowingly caused Natalie serious bodily injury by failing to provide adequate food or medical care. Natalie died of malnutrition and had a number of other health-related issues. Luna knew that Natalie had lost weight, knew the importance of watching her weight and the need to see a doctor if she lost weight, knew the seriousness of impetigo and that Natalie's impetigo had returned, and knew that Natalie had an open ulcer with exposed bone. Luna had been encouraged by relatives to feed Natalie more or to take her to a doctor. The number of bruises and scars on Natalie's body would have caused any healthcare provider concern and may explain why she did not take Natalie to the doctor and why she lied to relatives about doing so. Luna was not prevented from taking Natalie to the doctor, acquiring medication for her ulcer or impetigo, or feeding her. Each of these was the result of a conscious decision with knowledge that Natalie's health was being

risked. Furthermore, there was testimony from impartial witnesses that Natalie's appearance alone indicated the need for medical attention—testimony definitively corroborated by the emergency room photographs.

### 3. Factual Sufficiency.

■ Luna argues alternatively that, if the evidence is legally sufficient, it is factually insufficient. Luna points to testimony from relatives that they never saw her strike Natalie or thought she needed to see a doctor, and she points to conflicting testimony between Dr. Natarajan and Dr. White. Dr. White was critical of Dr. Natarajan's use of the word "neglect" as a cause of death because it is not a proper medical term. Dr. White agreed that Natalie died as a result of malnutrition but did not believe that she had been intentionally starved because she had food in her stomach and intestines at the time of her death. He agreed that Natalie had extensive bruises of a suspicious nature but noted that she had no internal injuries. Dr. White testified that Natalie could have suffered from a disease that prevented her from properly absorbing nutrients, was critical of Natalie's follow-up care after being released from the Lubbock hospital, and opined that she had an underlying metabolic genetic abnormality. Dr. Higgins disagreed with this last opinion. He testified that Natalie did not have a chronic metabolic disease.

The jury was authorized to resolve any conflicts between Dr. Natarajan, Dr. Higgins, and Dr. White's testimony. Consequently, the mere fact that there was some disagreement between two doctors does not make the evidence factually insufficient. Moreover, we note that Dr. White's testimony was not completely exculpatory. He agreed with much of the autopsy report. He testified that the extent of Natalie's bruising was suspicious, he had concerns over the fact that she was not taken to the doctor, and he testified that her ulcer needed medical attention.

Luna understandably focuses on differences in the doctors' testimony regarding how and why Natalie died. Our review, however, concerns the jury's finding of injury to a child. Even if Dr. White was correct that Natalie's malnutrition was caused by a genetic disorder rather than lack of food, this would have manifested itself by physical symptoms such as weight loss.[2] Luna was aware that Natalie had been losing weight and had been told to take her back to the doctor if this occurred. Luna did not do so. The jury could have considered Dr. White's testimony and still concluded that Luna knowingly or intentionally caused Natalie serious bodily injury by failing to provide adequate food or medical care. Dr. White's testimony, therefore, does not make the evidence factually insufficient. Issue one is overruled.

### B. Did the Trial Court Err by Admitting Autopsy Photographs?

■ The State offered a number of photographs from Natalie's autopsy. Some of these photographs were taken after invasive procedures had started, and they revealed Natalie's chest cavity, internal organs, and skull. Luna objected contending that the photographs were unfairly prejudicial because of their graphic nature. The trial court overruled that objection. The trial court found that words alone could not fully illustrate that which the photographs portrayed and that the num-

---

**2.** Dr. Gross testified that metabolic disease manifests itself in growth failure, failure to thrive, and weight loss. It can also manifest itself with seizures, skin rashes, abnormal pigmentation, excessive hair growth, lumps and bruises, enlarged lymph nodes, excessive urination, renal failure, and dehydration.

ber of photographs had been reduced to a small number showing different injuries. The trial court concluded that the prejudicial effect of the photographs did not outweigh their probative value.

We review the trial court's decision to admit photographs for an abuse of discretion. *Paredes v. State,* 129 S.W.3d 530, 539 (Tex.Crim.App.2004). There is no abuse of discretion when the trial court's ruling lies within the zone of reasonable disagreement. *Moses v. State,* 105 S.W.3d 622, 627 (Tex.Crim.App.2003). A photograph is generally admissible if verbal testimony about the matters depicted in the photograph is also admissible. *Paredes,* 129 S.W.3d at 539. A trial court does not err merely because it admits into evidence photographs which are gruesome. *Id.* at 540. However, even though relevant, photographs may still be inadmissible if their probative value is outweighed by the danger of unfair prejudice. Tex.R. Evid. 403. This requires consideration of the number of photographs offered, their detail and size, whether they are black and white or color, whether they are close up, the availability of other means of proof, and the circumstances unique to each individual case. *Sonnier v. State,* 913 S.W.2d 511, 518 (Tex.Crim.App.1995).

Dr. Natarajan testified that he selected twenty-four to twenty-five autopsy photographs to depict Natalie's injuries, that he tried to avoid repetition, and that it was difficult to visualize her injuries without the photographs. His testimony incorporated the photographs. For example, he testified about the lack of body fat on Natalie's chest wall and around her bowel and the appearance of that body fat. He referred to the photos to help illustrate this testimony.

We have independently examined the photographs. They are in color, are not inordinately large, appear to have been taken by someone standing next to the autopsy table, and depict what someone participating in the autopsy would have observed. Some of the photographs are graphic in nature, and some show the results of the autopsy itself. Because this case arises out of the death of a small child, they necessarily have an emotional impact. We cannot, however, conclude that the trial court abused its discretion. The trial court's findings that the photos were reasonable in number, that they illustrated matters impossible to describe with words alone, and that their probative value was not outweighed by their prejudicial effect are supported by the record. Issue two is overruled.

*C. Did the Trial Court Err by Denying Luna's Objection to the Charge?*

Luna objected to the charge because it contained different levels of offenses of causing bodily injury to a child and requested that it instead include *only* the lesser included offenses of manslaughter and criminally negligent homicide. Luna reasons that the jury believed that she did not intend for Natalie to die and that the only reasonable conclusion a juror could have drawn was that she acted recklessly or with criminal negligence. Luna argues that she was harmed because the court's charge effectively gave the jury a second way to convict her of murder and a way to impose a substantial punishment without finding that she intentionally killed Natalie.

When we review a trial court's decision to include or exclude a lesser included offense, we consider the charged offense, the statutory elements of the lesser offense, and the evidence actually presented at trial. *Hayward v. State,* 158 S.W.3d 476, 478 (Tex.Crim.App.2005). We then employ a two-part test. First, the lesser included offense must be included with the proof necessary to establish the offense charged. *Rousseau v. State,* 855

S.W.2d 666, 672–73 (Tex.Crim.App.1993). Second, some evidence must exist in the record that, if the defendant is guilty, she is guilty only of the lesser offense. *Id.*

▆ Manslaughter and criminally negligent homicide are both lesser included offenses of capital murder. *Cardenas v. State,* 30 S.W.3d 384, 392–93 (Tex.Crim. App.2000). However, injury to a child is also a lesser included offense. *Paz v. State,* 44 S.W.3d 98, 101 (Tex.App.–Houston [14th Dist.] 2001, pet. dism'd). We have previously held that the evidence is legally and factually sufficient to support Luna's conviction. The trial court, therefore, did not err by including injury to a child in the charge. *Cf. Chase v. State,* 968 S.W.2d 943, 946 (Tex.App.–Eastland 1998, pet. ref'd) (if evidence from any source raises the issue of a lesser included offense, a requested charge on that offense must be included). Issue three is overruled.

*D. Did the Trial Court Erroneously Admit Hearsay Evidence?*

▆ Luna complains that the trial court erroneously allowed Leann Hicks, a licensed professional counselor, to testify about statements B.N.L.V. made to her during the course of counseling sessions, contending this was inadmissible hearsay. Hicks testified that B.N.L.V. was referred to her by CPS for grief counseling. Hicks testified that B.N.L.V.'s statements to her were part of the counseling process, that the statements were made for the purpose of receiving medical treatment, that she stressed to B.N.L.V. the need to be truthful, and that she confirmed B.N.L.V.'s understanding of the difference between the truth and a lie.

Hicks testified that B.N.L.V. was four years old when their counseling sessions started. The first session occurred at B.N.L.V.'s house with her family present. Hicks began meeting with B.N.L.V. individually when she was placed with a foster family. During one of the individual sessions, B.N.L.V. said, "I wish we hadn't of been so mean to my baby sister, Natalie." She told Hicks that she had accidently hit Natalie with a rope. She also told Hicks that Natalie had been bad, that Natalie had gotten a cookie and a banana without permission, and that Natalie was picking her nose. According to B.N.L.V., Natalie got into trouble for getting food several times and was spanked by her mother for doing so.

Hicks testified that B.N.L.V. began to exhibit symptoms of post-traumatic stress disorder. B.N.L.V. started wetting herself and was having nightmares. Those nightmares began to incorporate her father. B.N.L.V. said that, when her father got mad, he hit Natalie in the face, back, and legs. She told Hicks that Natalie was kicked and thrown in the corner and that her father grabbed Natalie by the hair. Hicks witnessed B.N.L.V. have a flashback. B.N.L.V. illustrated with a doll her father stepping on Natalie, kicking her into a corner, and grabbing her hair. According to Hicks, B.N.L.V. was afraid of both her parents. She expressed a fear that they would hurt her too and that she would die like her sister.

▆ B.N.L.V.'s statements to Hicks are hearsay, but the State argues that they fall within the medical diagnosis or treatment exception. TEX.R. EVID. 803(4). The crucial issue under Rule 803(4) is whether the out-of-court statement was reasonably pertinent to medical diagnosis or treatment. *Gregory v. State,* 56 S.W.3d 164, 183 (Tex.App.–Houston [14th Dist.] 2001, pet. dism'd). Texas courts have allowed non-physicians to testify under this exception. *See, e.g., Taylor v. State,* No. 01–05–01183–CR, 2007 WL 2214859 (Tex. App.–Houston [1st Dist.] Aug. 2, 2007, pet. granted) (licensed professional counselor); *Horner v. State,* 129 S.W.3d 210, 219 (Tex.

App.–Corpus Christi 2004, pet. ref'd) (medical social worker); *Wilder v. State*, 111 S.W.3d 249, 256 (Tex.App.–Texarkana 2003, pet. ref'd) (licensed professional counselor); *Puderbaugh v. State*, 31 S.W.3d 683, 685 (Tex.App.–Beaumont 2000, pet. ref'd) (clinical social worker); *Gohring v. State*, 967 S.W.2d 459, 461 (Tex.App.–Beaumont 1998, no pet.) (play therapist working under the supervision of a licensed psychologist); *Moyer v. State*, 948 S.W.2d 525, 527–28 (Tex.App.–Fort Worth 1997, pet. ref'd) (paramedic); *Torres v. State*, 807 S.W.2d 884, 886–87 (Tex.App.–Corpus Christ 1991, pet. ref'd) (emergency room nurse); *Macias v. State*, 776 S.W.2d 255, 258–59 (Tex.App.–San Antonio 1989, pet. ref'd) (psychologist).

The trial court did not abuse its discretion by finding that Hicks's testimony was admissible. Hicks had seventeen years experience as a counselor. She testified that she utilized B.N.L.V.'s statements to diagnose and treat B.N.L.V. and that this is the type of information upon which counselors normally rely. This is sufficient evidence to support the trial court's exercise of discretion. Issue four is overruled.

*E. Did the Trial Court Err by Denying the Motion to Sever?*

 If Hicks's testimony was admissible, Luna argues that the trial court erred by denying her motion to sever because B.N.L.V.'s statements regarding her father's actions were so prejudicial that it resulted in an improper verdict. The trial court has the discretion to try two defendants together when they are indicted for the same offense or any offense growing out of the same transaction. TEX.CODE CRIM. PROC. ANN. art 36.09 (Vernon 2007). This statute also gives the trial court the discretion to sever the defendants upon evidence that one has a previous admissible conviction or a joint trial would prejudice the moving defendant. *Qualley v.*

*State*, 206 S.W.3d 624, 631 (Tex.Crim.App. 2006).

 Article 36.09's legislative history indicates that the legislature intended two defendants accused of the same offense to ordinarily be tried together. *Id.* at 632. The prejudice required to support a severance, therefore, must be more than the circumstances or disagreements between parties that would normally be expected to arise during any trial containing multiple defendants. *Id.* The previous admissible conviction ground is applicable only if the conviction is admitted at trial. *Rivello v. State*, 476 S.W.2d 299, 300 (Tex. Crim.App.1971).

The State argues initially that Luna's point is not properly before us because her motion for severance was predicated upon the prejudicial impact of evidence that Vasquez sexually assaulted their children. The State did not offer that evidence. The State points us to language in the *Qualley* decision that a new ground for severance is in essence a new motion and must be raised timely. 206 S.W.3d at 638. We agree with the State. Because Luna's motion for severance is predicated upon different grounds than those advanced on appeal, Luna has not preserved this issue.

 We note further, however, that the record does not establish an abuse of discretion by the trial court. Evidence implicating one defendant to a greater degree than the other is the type of evidence one would frequently expect to encounter in a trial involving multiple defendants. *Qualley* is clear that more is required to establish the requisite prejudice. 206 S.W.3d at 632. Moreover, Hicks's testimony implicated both defendants. Luna correctly notes that some of the most compelling testimony was B.N.L.V.'s statements describing her father's abusive behavior. However, Hicks also related B.N.L.V.'s statements that she was afraid of both

**832**

parents, that they were mean to Natalie because she was bad, that Luna spanked Natalie for getting food, and that she was afraid they would hurt her too. Finally, B.N.L.V. told Hicks that both Luna and Vasquez had warned her not to talk to the counselor or to her foster parents. Issue five is overruled.

*F. Did the Trial Court Err by Refusing to Quash the Indictment and by Allowing the State to Amend It?*

■ Luna was originally indicted for failing to provide medical care or adequate food to Natalie. Prior to trial Luna filed a motion to quash, correctly pointing out that the indictment did not allege an offense because it did not allege that Luna had a duty to provide Natalie with food or medical care. The State responded with a motion to amend the indictment by adding an allegation that Luna had a duty to act because she was Natalie's parent. The trial court granted the State's motion to amend.

Luna argues that this was error because an indictment may not be amended over the defendant's objection if the amended indictment charges the defendant with an additional or different offense, or if the defendant's substantial rights are prejudiced. TEX.CODE CRIM. PROC. ANN. art. 28.10(c) (Vernon 2006). We disagree. The original indictment charged Luna with capital murder by failing to provide medical care or adequate food to a child younger than six years of age. TEX. PENAL CODE ANN. § 19.03(8) (Vernon Supp.2007). The amended indictment alleged the same offense but merely added a missing element. This does not violate Article 28.10(c). *Flowers v. State,* 815 S.W.2d 724, 728–29 (Tex.Crim.App.1991). Issue six is overruled.

IV. *Holding*

The judgment of the trial court is affirmed.