

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00061-CR

_____

AUSTIN KYLE DAVIS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 202nd Judicial District Court
Bowie County, Texas
Trial Court No. 08F0682-202

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

After he was convicted by a jury of murder and assessed a sentence of life imprisonment, Austin Kyle Davis has filed his appeal. He now complains that the evidence was legally and factually insufficient to support the jury's findings, that the trial court erred in admitting photographs of the deceased victim into evidence, that he was improperly refused a lesser-included offense instruction, and that the victim's mother should not have been allowed to testify as victim impact evidence.

## I.  Factual and Procedural History

Davis had been a friend of the victim, Beau Watty Gibson. However, there was an offense by Davis against Gibson for which Davis was jailed, and Davis was forced to post bond. Ten days before Gibson's death, Davis's girlfriend, Ramona Johnson, collected $500.00 to secure release on bond. The need for the expenditure of bond money infuriated Davis. Johnson, called as an adverse witness by the State, testified that Davis said "he was going to go and get that fool's weed and he was going to resell it to make the money back that I had to put up for the bond. Just in general, just about every day I had to talk him down out of going over there because he was angry." These same kinds of threats were overheard by Katherine Cunningham, a mutual friend of Davis and Gibson. Cunningham testified that Davis had said that "he was going to go over to [Gibson]'s house and kill him. . . . He just -- he thought about it and he said, f*** it, I'm just going

2

to go over there and take his s*** and get my money back." Johnson and Cunningham failed to report the threats before the murder occurred.

Davis's anger did not subside. On the day of the murder, Davis discovered that his friend, David Sherrod, had a pistol for sale, and Davis asked Sherrod if he could try out the gun before purchasing it. Sherrod agreed and lent him the .357 "Smith & Wesson Model 686 six inch barrel, Pachmayr type grip, stainless steel" pistol. Johnson and Davis's friend, Cory Sutton, both witnessed Davis cleaning the firearm. After Davis repeatedly asked to borrow Johnson's red Honda to take to Gibson's apartment, Johnson "finally just told him to go." Davis then left with Sutton. Fifteen minutes after he had left, Davis called Johnson and told her she needed to go to the Woodlands apartments, where Gibson lived, and retrieve the car he had borrowed from her.

It was during that fifteen-minute period that Gibson was killed. According to Sutton, Davis knocked on Gibson's door and the pair were allowed entry. Davis walked to a futon in the living area and sat beside Gibson and his girlfriend, Britney Morris, and the group engaged in small talk about movies. Morris's friend Brandi Lee Chisum Rabozzi was also present at Gibson's apartment. Because Sutton did not know Gibson, he chose to not sit in the living room with the others but, instead, remained close to the wall beside the front door. Suddenly, Davis pulled out a gun from his hoodie; this frightened Sutton, who immediately ran out the door of the second-story apartment and down the stairs. Pausing at the foot of the stairs when he heard gunshots, Sutton then ran behind the apartment, jumped a fence, and continued running until he

3

reached his home.  Sutton testified that no one had threatened Davis and that the only weapon displayed while he was in the apartment was that carried by Davis.

Seventeen-year-old Morris described the horrific scene which unfolded.  She was looking forward to enjoying a movie with Gibson and Rabozzi when Davis and Sutton arrived.  They were sitting on the futon when Davis got up, picked up her backpack from the front of the apartment, and walked toward the door.  Because her car keys and wallet were in the backpack, she tried to wrestle it from Davis's hands.

Rabozzi said that Morris "reached for the bag and began grappling with [Davis], kind of tugging at it.  And I recall him pointedly not trying to, you know, point the gun at her, but he was roughing her, you know, and pushing her around, trying to get her off him."  Gibson "had gotten up when they started tussling. . . . And after [Davis] pushed Britney to the floor, [Gibson] made the move to go around me the opposite direction of everybody else."  At first, Davis held the gun close to his chest.  Rabozzi "felt [Gibson] move past [her], and it was at that point that I believe [Davis] realized that [Gibson] was going for his own gun, and he aimed or he drew down in our direction."  Davis "held the gun up in the air and said, mother f*****, you costed [sic] me $500" and began to shoot the pistol.  "The gun was thunderous from the front of the apartment."  Eventually, Gibson retrieved his gun and was able to return fire.  The sound of Davis's .357 "overpowered" the "pop" made by Gibson's .380.

4

Belinda Ann Williams, who was living in the Woodlands apartments, heard the gunshots as she was checking her mail. She saw "two guys running from the side of the building." One got into a red Honda and sped off, while the other ran behind a building. After the rapid exchange of gunfire ended, Davis approached Gibson, grabbed Gibson's and Morris's cell phones, and rushed out of the apartment.

Davis is known to have made two telephone calls shortly after the shooting. One of those calls (to which reference has already been made) was to Johnson, telling her to come retrieve her car. In the other, Davis telephoned his friend Charles Lance Matthews (who was also living in the Woodlands apartments) and told Matthews that "he had put something on my porch and to put it up for him." Matthews located a pistol on his porch and took it to a girlfriend's mother's home, where he hid it in a plastic toy.

Rabozzi "could tell that something was wrong. [Gibson] wasn't moving." Panic ensued. Rabozzi ran to the balcony and "started yelling for a phone." Conquilla Rudd and her friend heard cries for help and called the police. Rudd went to the apartment and observed Rabozzi with a gun. She later learned the gun belonged to Gibson. Rudd wrapped the gun in a towel.

Officer Ed Steger arrived at the crime scene within two minutes of the police dispatch seeking aid. Rudd handed him Gibson's .380 pistol and Williams alerted him to two cell phones that she had found on the ground. Steger recounted that Gibson was lying on his back and "[t]here was a large pool of blood to the left side of his head and what I assume was some type of

5

brain matter. His eyes were open." LifeNet arrived and Gibson was rushed to the hospital, where he died later in the night from a gunshot wound to the head.

Johnson walked to the home of her neighbor Robert Jackson and asked for a ride to the Woodlands so she could get her car. Ambulances and police cluttered the parking lot as Jackson pulled his automobile onto the grounds of the Woodlands. They discovered Davis sitting on some steps and waiting for her arrival. Seeing her, Davis then told Johnson that Gibson "went crazy and started shooting at him so he ran" and that he could not drive the Honda because he "knew [the] car was going to be pulled over." Davis jumped into Jackson's car while Johnson got out, started her red Honda, and left for home alone. Davis asked Jackson to drop him off before arriving home. When Jackson pulled into his driveway, the police were already at Davis's house next door. Next, Sutton came to Jackson's house and nervously asked him for advice as to what to tell the police. He told Sutton to turn himself in and tell the truth.

Johnson, who had driven the red Honda home, noticed that Davis was not there. Although Davis was not there, police were, and Officer Joshua Laster questioned her. While Laster was questioning Johnson, she received a call on her cell phone from a land line. The phone was confiscated and, from the telephone number shown for the last call received, the call was determined to have originated at an address on Beech Street in Texarkana. Upon going to that address, Laster located Davis sitting with a friend on the front porch of the house located there.

Davis identified himself with the fictitious name of Thomas Johnson and provided a false birth date as well. He was detained after confirmation that the identity was false.

Davis was placed in an interrogation room after being taken into custody. After Detective Matt Cashatt "heard some furniture banging around in that room," he looked through the door's peephole and observed Davis dusting himself off. When Cashatt entered the room, he discovered that Davis had pulled down ceiling tiles and the surrounding aluminum framework in an apparent effort to escape, leaving a large hole in the ceiling. Cashatt placed Davis in handcuffs and left. Cashatt "immediately went back to that room's observation window and observed [Davis] transfer his cuffs from behind his back . . . under his feet to the front, and he began to tug on his cuffs." Fearing Davis might continue trying to escape, Cashatt placed him in a maximum security cell. Cashatt later discovered that Davis had draped a wad of wet tissue over the observation camera in an effort to obscure the quality of video in the interrogation room.

An interview was conducted the following day during which Davis stated that Gibson shot at him first. The version of events Davis gave changed throughout the interview. Finally, he admitted to taking a gun to Gibson's house because he was "mad cuz the fool cost me $500." Davis said he fired six or eight shots with a .357 pistol, that "I shot the dude, I did it," and admitted he left the gun on Matthews's porch. After the termination of the interview, Davis again attempted to escape through the ceiling after officers left the room.

Despite the accounts above given at trial, Davis argues the evidence was legally and factually insufficient to prove he committed murder. Specifically, he argues that Gibson was killed with a fragment of a bullet discharged from Gibson's own gun and that there is no evidence to rebut that assertion.

## II. The Jury's Verdict Was Supported by Legally and Factually Sufficient Evidence

The Fourteenth Amendment's due process guarantee "prohibits a criminal defendant from being convicted of an offense and denied his liberty except upon proof sufficient to persuade a rational fact finder of guilt beyond a reasonable doubt." *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003).

### A. The Hypothetically-Correct Jury Charge

Our analysis of whether the proof is sufficient is measured against the elements of a hypothetically-correct murder jury charge.[1] *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *see also Grotti v. State*, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008). The hypothetically-correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240. It is used to evaluate both legal and factual sufficiency. *Grotti*, 273 S.W.3d at 281.

---

[1]*Malik* controls "even in the absence of alleged jury charge error." *Gollihar v. State*, 46 S.W.3d 243, 255 (Tex. Crim. App. 2001).

Davis was indicted for intentionally or knowingly causing Gibson's death in violation of Section 19.02 of the Texas Penal Code. TEX. PENAL CODE ANN. § 19.02 (Vernon 2003). Under a hypothetically-correct charge in this case, the jury was required to find, beyond a reasonable doubt, that: (1) Davis; (2) intentionally or knowingly; (3) caused the death; (4) of Gibson. *Id.* Davis acted intentionally if it was his "conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003). He acted knowingly if he was "aware that his conduct [was] reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003).

**B.      The Evidence Was Legally Sufficient to Prove Davis Caused Gibson's Death**

The requirement of legal sufficiency confirms that a fact question was raised by the evidence. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). If the evidence in this case was insufficient to raise an issue of Davis's guilt, there was no issue for the jury's resolution. *Id.* When conducting a legal sufficiency analysis, we review all of the evidence in the light most favorable to the verdict and determine whether any rational jury could find the essential elements as charged by the indictment beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Lacour v. State*, 8 S.W.3d 670, 671 (Tex. Crim. App. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)); *Clewis*, 922 S.W.2d at 132–33; *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

Here, all of the witnesses at trial and Davis's own confession, identified Davis as the shooter. There was also evidence that Gibson's death was caused by a bullet wound to the head. The jury could connect the dots. This leaves the elements of *mens rea* and causation.

Davis's requisite culpable mental state could be inferred from surrounding circumstances, his acts, words, and conduct. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984); *Dunn v. State*, 13 S.W.3d 95, 98–99 (Tex. App.—Texarkana 2000, no pet.). He had previously committed a crime against Gibson and made threats that he planned on killing him after he bonded out of jail. He made a calculated decision to borrow a gun from a friend, clean it on the day of the murder, and begged for his girlfriend's car to take to the Woodlands, where Gibson lived. He took someone who did not know Gibson, instead of going alone. Anger over the cost of the bond was apparent when he yelled "you costed [sic] me $500" to Gibson before shooting at him. "Motive is a significant circumstance indicating guilt." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Undoubtedly, any rational juror could find beyond a reasonable doubt at this point that Davis was aware that shooting a gun in Gibson's direction was reasonably certain to cause death. *Castillo v. State*, 899 S.W.2d 391, 394 (Tex. App.—Houston [14th Dist.] 1995, no pet.); *Murray v. State*, 861 S.W.2d 47, 53 (Tex. App.—Texarkana 1993, pet. ref'd). Also, "[t]here is no evidence that, in doing the act, he intended only to injure and not to kill." *Murray*, 861 S.W.2d at 53.

10

Davis's actions after the murder were further indications of guilt. He dropped the gun off at a friend's porch, instructed his friend to get rid of the evidence, and called his girlfriend to pick up her car so he would not get pulled over in it. He grabbed Gibson's and Morris's cell phones so they could not be used to call for help and dropped them on the ground in the Woodlands to avoid being caught with them. Instead of going home, he had Jackson drop him off at a friend's street and lied to the police about his name after he was found. When taken into custody, he repeatedly desperately tried to escape. Evidence of flight is another circumstance from which the jury can draw an inference of guilt. *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994). We find that a rational juror could have determined Davis had the requisite *mens rea*.

Unfortunately, the bullet fragment removed from Gibson's brain, which appeared to be the core of a jacketed bullet, could not be matched up with any particular gun. Davis's primary contention (i.e., that there is no proof that it was a bullet fragment from his gun versus a fragment from Gibson's gun that killed Gibson) focuses our attention to causation. We note that the gist of Davis's theory is addressed by statute: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE ANN. § 6.04 (Vernon 2003). Here, before the gunfight ever took place, Davis expressed an intention to kill Gibson and after the encounter, Davis specifically admitted that "I shot him, I did it." By his own words, Davis acknowledged that it

11

was a bullet from the gun he was using which killed Gibson and not some errant ricochet from Gibson's gun.

Further, other evidence seems to ratify Davis's statement. It appeared that six bullets, (numbered one through six) were fired from the front of the apartment, whereas two (numbered seven and eight) were fired from the middle and back of the apartment toward the front door. Morris and Rabozzi both described Davis as holding his gun high in the air, pointing it downward and shooting while standing close to the front of the apartment. Bullets one and two hit a wall separating the front of the apartment from the kitchen. The bullets entered on the side of the wall facing the front door. Bullet three hit the kitchen counter in an obvious downward direction, bullet four entered the wall nine and one-half inches from the floor, bullet five also hit a wall one foot above the floor, and bullet six went through a bed in the apartment and lodged itself in the wall, one foot four inches above the floor. Evidence that bullets one through six were fired by Davis was corroborated by his own statement during the interview. Officer Shawna Yonts, who investigated the apartment scene, stated that bullets one through six were travelling from right to left, while bullets seven and eight were travelling in a different direction. Not only did these bullets appear to have been fired from the front from right to left, but they seemed to be travelling in a downward direction.[2] This evidence (that six bullets shot from the front door at a right to left downward trajectory) is important for one reason.

---

[2]Bullet eight appeared to have an upward trajectory as it entered through the door, with bullet seven hitting the front wall in the same direction.



Gibson's autopsy report said "[o]n the left side of the head, there is a 3/4 inch in diameter, irregular, stellate gunshot wound . . . . The trajectory of the bullet is left to right, slightly downward, with no significant front or back deviation."[3]   If Gibson was facing Davis while he shot at him, as Morris and Rabozzi testified, the general trajectory of the bullet as it entered his body was consistent with the trajectory of bullets one through six, which sufficient evidence establishes were fired by Davis as he stood at the front of the apartment firing from his right to left. Dr. Daniel Lingamfelter, who conducted the autopsy, testified he did not believe the wound was

---

[3]The report indicated the bullet went through an object, broke up, and then hit Gibson.

13

self-inflicted.   A rational juror could find Davis was the person holding the gun which ejected a bullet that killed Gibson.

We conclude the evidence was legally sufficient to support the finding that Davis intentionally or knowingly caused Gibson's death.

**C.**     **The Evidence Was Factually Sufficient to Support the Verdict**

Unlike legal sufficiency review, we examine the evidence in a neutral light when assessing factual sufficiency and determine whether the proof of guilt is so obviously weak as to undermine confidence in the verdict, or, if taken alone, is greatly outweighed by contrary proof so as to be clearly wrong and unjust.   *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); *Harris v. State*, 133 S.W.3d 760, 764 (Tex. App.—Texarkana 2004, pet. ref'd).   A clearly wrong and unjust verdict is manifestly unjust, shocks the conscience or clearly demonstrates bias.   *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997).   Because factual sufficiency is an issue of fact, we are not free to reweigh the evidence and set aside the verdict merely because we feel a different result is more reasonable.   *Clewis*, 922 S.W.2d at 135.

Thus, if we determined the evidence raised issues for the jury's resolution, we will not sit as the thirteenth juror, re-evaluating the weight and credibility of the evidence.   *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).   Instead, we give full play to the jury's responsibility to weigh the evidence, resolve

14

conflicts in the testimony, and draw reasonable inferences from basic facts. *Johnson*, 23 S.W.3d at 7; *Clewis*, 922 S.W.2d at 133; *Bottenfield v. State*, 77 S.W.3d 349, 354 (Tex. App.—Fort Worth 2002, pet. ref'd) (citing *Jackson*, 443 U.S. at 319).

Aside from witness attacks on credibility and memory, which the jury was free to resolve, Davis makes three arguments suggesting that the evidence was factually insufficient in his brief. First, he makes the (rather incredible) claim that the State failed to put on any evidence that Davis intended to do harm. Amazingly, he cites Cunningham's testimony and suggests it somehow stands for the proposition that Davis intended not to harm Gibson. We disagree completely. Cunningham testified Davis said, "he was going to go over to [Gibson]'s house and kill him." That he also said "I'm just going to go over there and take his s*** and get my money back" does nothing to "negate" Davis's death threat.

Next, Davis cites the following exchange in the record:

> Q      [The State] Did any of the three of you pull a gun prior to [Gibson] pulling his?
>
> A      [Morris] No, sir.

A review of the record indicates that the State misspoke and did not catch the mistake in the names, but the context is clear. Earlier, Morris had clearly testified that Gibson did not have a gun when Davis pulled out his weapon. Her description of the occurrence clarified that Davis was first to draw his weapon and Morris also spoke in terms of Gibson returning fire. Rabozzi's testimony further clarified that Davis shot at Gibson before Gibson could retrieve his gun.

15

Finally, Davis maintains that there was no testimony that Gibson was killed by a bullet fragment from a bullet which came from Davis's gun. However, testimony that Gibson was killed by a bullet wound to the head, coupled with the trajectory of the bullets in the apartment, provided a jury with ample evidence to find otherwise.

In reviewing all of the evidence in a neutral light, we cannot say the evidence of Davis's guilt was greatly outweighed by testimony or evidence reflecting the defensive theory. We find nothing unjust or shocking about the verdict and conclude the evidence was factually sufficient to support it.

## III. The Trial Court Did Not Abuse Its Discretion in Admitting Photographs

"The admissibility of a photograph is within the sound discretion of the trial judge." *Paredes v. State*, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004); *see also McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008); *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). A trial court abuses its discretion if its decision is outside the zone of reasonable disagreement. *McCarty*, 257 S.W.3d at 239 (citing *Zuliani*, 97 S.W.3d at 595). Unless there is clear abuse of the trial court's discretion, its ruling will not be reversed. *Id.*

At trial, the State admitted photographs of Gibson in the hospital after he had died. Davis makes an elaborate argument that these photographs were "offered solely to inflame the jury" and that the probative value of the pictures was substantially outweighed by the danger of unfair prejudice. He cites cases referencing Rule 403 of the Texas Rules of Evidence. TEX. R. EVID.

16

403. However, no such issue has been preserved for our review.[4] Instead, the record reveals that counsel had not made a reference to the inflammatory nature of the photographs but had, instead, made a mere objection to relevance under Rule 401 of the Texas Rules of Evidence.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. The threshold for relevance is low. *Ex parte Moreno*, 245 S.W.3d 419, 425 n.20 (Tex. Crim. App. 2008) (citing *Tennard v. Dretke*, 542 U.S. 274, 285 (2004)). "A photograph is generally admissible if verbal testimony about the matters depicted in the photograph is also admissible." *Luna v. State*, 264 S.W.3d 821, 829 (Tex. App.—Eastland 2008, no pet.) (citing *Paredes*, 129 S.W.3d at 539). A trial court does not err in admitting photographs merely because they are gruesome. *Paredes*, 129 S.W.3d at 540.

The State was required to prove Gibson's death was caused by a gunshot wound to the head.[5] The photographs were taken as a part of Yonts's investigation and were used to explain the manner and circumstances of death. Therefore, although the photographs may have been

---

[4]To preserve error for appellate review: (1) the complaining party must make a timely objection specifying the grounds for the objection, if the grounds are not apparent from the context; (2) the objection must be made at the earliest possible opportunity; and (3) the complaining party must obtain an adverse ruling from the trial court. *See* TEX. R. APP. P. 33.1(a)(1).

[5]We note that there was no stipulation in this record as to the cause of Gibson's death. In any event, the Texas Court of Criminal Appeals has determined that an offer to stipulate to the cause of death of a victim does not preclude admission of photographs demonstrating the cause, and does not render them less probative. *Newbury v. State*, 135 S.W.3d 22, 43–44 (Tex. Crim. App. 2004) (autopsy photographs held admissible over offer to stipulate to means of death as gunshot wound).

gruesome, they were relevant. We conclude that the trial court did not abuse its discretion in overruling Davis's Rule 401 objection. This point of error is overruled.

## IV. Davis Was Not Entitled to an Instruction to the Jury of a Lesser-Included Offense

Davis next argues that the trial court erred in refusing to submit an instruction on what Davis claims was the lesser-included offense of deadly conduct.[6] While deadly conduct, under the proper circumstances, can be deemed a lesser-included offense of murder, Davis would only be entitled to the jury instruction if there was "'some evidence' that, if the defendant is guilty, he is guilty only of the lesser-included offense." *Flores v. State*, 245 S.W.3d 432, 439 (Tex. Crim. App. 2008); *Ortiz v. State*, 144 S.W.3d 225, 233–35 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd).

The element distinguishing deadly conduct from murder is the *mens rea*. Here, Davis claims the following evidence negates the elements of murder: (1) Cunningham's erroneously interpreted testimony regarding the nature of the threat to Gibson; (2) "[t]hat [Davis] specifically avoided pointing the gun at [Morris][7] . . . when the scuffle for the backpack occurred"; (3) the

---

[6]Davis asks us to modify the judgment to reflect conviction of deadly conduct. A court of appeals may modify a judgment of conviction to reflect conviction of a lesser-included offense if it finds that the evidence is legally insufficient to support conviction of the charged offense, but sufficient to support conviction of the lesser-included offense. *Herrin v. State*, 125 S.W.3d 436, 443–45 (Tex. Crim. App. 2002); *Lackey v. State*, 290 S.W.3d 912, 920 (Tex. App.—Texarkana 2009, pet. ref'd); *Murray*, 861 S.W.2d at 53.

[7]Davis claims that the record showed he "avoided pointing the gun at others in the apartment when the scuffle for the backpack began." Again, Davis misreads the record, which only says he avoided pointing the gun at Morris.

18

erroneous contention (based on Morris's misspeak[8]) that Davis was not the first to pull a gun; and (4) the theory that the bullet fragment ricochet which slew Gibson was not a deliberate shot. Davis also says "the location of the bullet holes at the crime scene show that the shots were strewn about the room, clearly showing that any shots fired by [Davis] were done so recklessly." We conclude this "evidence" does not negate the elements of murder; the jury could conclude that the fact that the small apartment was liberally sprayed with gunshots was simply evidence of poor marksmanship and this did nothing to absolve him from intent. Again, Cunningham testified Davis said he was going to kill Gibson. The fact that he also stated he was going to rob Gibson does not negate the greater offense. The record says Davis, who drew a gun first, avoided only pointing it at Morris during the scuffle, and thus again does not negate the greater offense. Even if Davis's statement during his interview (during which he stated that Gibson shot first) was to be believed, the idea that Davis intentionally or knowingly caused Gibson's death when he supposedly returned fire would not have been cancelled out. No evidence was introduced suggesting that the ricochet was not a deliberate shot. In fact, Davis said "I shot him, I did it." Further, the idea that six rounds were fired before one reached its mark does not suggest the shots were fired only recklessly. We conclude that because this was not "some evidence" negating the greater offense and supporting the idea that Davis was guilty only of the lesser-included offense, the trial court did not abuse its discretion in failing to submit an instruction on deadly conduct.

This point of error is overruled.

---

[8]Davis chose not to assert any self-defense claims.

### V.  Victim Impact Evidence During Punishment

Finally, Davis complains that the trial court erroneously allowed improper victim impact evidence through Gibson's mother during the punishment phase of the trial.  The record shows that there was no error committed here and even if error had been committed, the record demonstrates that the testimony regarding this issue was not preserved for our review.

Prior to the victim's mother taking the stand, Davis's counsel made a mere Rule 403 objection.  After the court overruled the objection, counsel asked for a running objection to the mother's testimony.  Without prompting, the trial court found "that based on the authority of the Court of Criminal Appeals in *Salazar v. State*[9] that it is permissible for victim impact testimony to come in to show the uniqueness of the individual in the case.  However, [Prosecutor], the Court will direct you and warn you to stay within the proper parameters of those guidelines."  The trial court went on to say, "[A]s far as a running objection on the fact of her testifying, I'll grant you.  If you feel like it's getting outside the scope of the testimony, you need to make those objections because I can't . . . . That's hard to do a running objection on that portion of it."  Despite Davis's understanding that the court would require objection if counsel believed that the testimony went beyond permissible victim impact testimony, the following exchange occurred without objection:

> Q      And has this loss, his loss, had a terrible impact on your family?
>
> A      Yes.   His brother cannot even be here at this trial.   Emotionally he can't take this.   My mother is eighty-six years old.   This is killing her slowly, and it's killing me to watch this.   And my sister, she's -- we're a very close family.

---

[9]*Salazar v. State*, 90 S.W.3d 330 (Tex. Crim. App. 2002).

. . . . His brother is devastated. They're only fourteen months apart in age, so growing up they were inseparable, always together. Wherever there was [Gibson], there was Drew . . . .

The trial court was well advised to look to *Salazar* for guidance in this matter. In it, the Texas Court of Criminal Appeals observed that

> As a general proposition, victim-impact evidence may be admissible at the punishment stage of a criminal trial when that evidence has some bearing on the defendant's personal responsibility and moral culpability. As the Supreme Court stated in *Payne v. Tennessee*, such evidence is "designed to show . . . *each* victim's 'uniqueness as an individual human being,'" and is a way to inform "the sentencing authority about the specific harm caused by the crime in question." Such evidence is of two distinct, but related, types: victim *character* evidence and victim *impact* evidence. The former is designed to give the jury "a quick glimpse of the life that the petitioner chose to extinguish, to remind the jury that the person whose life was taken was a unique human being." The latter is designed to remind the jury that murder has foreseeable consequences to the community and the victim's survivors-family members and friends who also suffer harm from murderous conduct.

*Salazar*, 90 S.W.3d at 335 (footnotes omitted).

Davis made no objection concerning any possible hearsay in the testimony. We do not find that the testimony about which Davis now complains violated the parameters of permissible victim impact testimony as described in *Salazar*. Even if it had gone out of bounds, Davis's failure to object and preserve error left us with nothing to address.[10]

Even had timely objection been made and even though the impact would certainly have some emotional influence, it falls within the parameters of such proof as set out by *Salazar*. We overrule this point of error.

---

[10]This point of error was also not addressed in Davis's motion for new trial.

21

## VI.	Conclusion

We affirm the judgment of the trial court.

Bailey C. Moseley
Justice

Date Submitted:	February 16, 2010
Date Decided:	March 5, 2010

Do Not Publish