In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00061-CR

                                                ______________________________

 

 

                                     AUSTIN KYLE DAVIS,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                      On Appeal from the 202nd
Judicial District Court

                                                             Bowie County, Texas

                                                        Trial Court
No. 08F068-202

 

                                                     
                                             

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                            Memorandum Opinion by Justice Moseley








                                                     MEMORANDUM 
OPINION

 

            After
he was convicted by a jury of murder and assessed a sentence of life
imprisonment, Austin Kyle Davis has filed his appeal.  He now complains that the evidence was legally
and factually insufficient to support the jury’s findings, that the trial court
erred in admitting photographs of the deceased victim into evidence, that he
was improperly refused a lesser-included offense instruction, and that the
victim’s mother should not have been allowed to testify as victim impact
evidence.  

I.          Factual and Procedural
History

            Davis had been a
friend of the victim, Beau Watty Gibson. 
However, there was an offense by Davis against Gibson for which Davis
was jailed, and Davis was forced to post bond.  Ten days before Gibson’s death, Davis’s
girlfriend, Ramona Johnson, collected $500.00 to secure release on bond.  The need for the expenditure of bond money
infuriated Davis.  Johnson, called as an
adverse witness by the State, testified that Davis said “he was going to go and
get that fool’s weed and he was going to resell it to make the money back that
I had to put up for the bond.  Just in
general, just about every day I had to talk him down out of going over there
because he was angry.”  These same kinds
of threats were overheard by Katherine Cunningham, a mutual friend of Davis and
Gibson.  Cunningham testified that Davis
had said that “he was going to go over to [Gibson]’s house and kill him.
. . . He just -- he thought about it and he said, f*** it, I’m
just going to go over there and take his s*** and get my money back.”  Johnson and Cunningham failed to report the
threats before the murder occurred. 

            Davis’s
anger did not subside.  On the day of the
murder, Davis discovered that his friend, David Sherrod, had a pistol for sale,
and Davis asked Sherrod if he could try out the gun before purchasing it.  Sherrod agreed and lent him the .357 “Smith
& Wesson Model 686 six inch barrel, Pachmayr type grip, stainless steel”
pistol.  Johnson and Davis’s friend, Cory
Sutton, both witnessed Davis cleaning the firearm.  After Davis repeatedly asked to borrow
Johnson’s red Honda to take to Gibson’s apartment, Johnson “finally just told
him to go.”  Davis then left with
Sutton.  Fifteen minutes after he had
left, Davis called Johnson and told her she needed to go to the Woodlands
apartments, where Gibson lived, and retrieve the car he had borrowed from her. 

            It
was during that fifteen-minute period that Gibson was killed.  According to Sutton, Davis knocked on Gibson’s
door and the pair were allowed entry. 
Davis walked to a futon in the living area and sat beside Gibson and his
girlfriend, Britney Morris, and the group engaged in small talk about
movies.  Morris’s friend Brandi Lee
Chisum Rabozzi was also present at Gibson’s apartment.  Because Sutton did not know Gibson, he chose
to not sit in the living room with the others but, instead, remained close to
the wall beside the front door. 
Suddenly, Davis pulled out a gun from his hoodie; this frightened
Sutton, who immediately ran out the door of the second-story apartment and down
the stairs.  Pausing at the foot of the
stairs when he heard gunshots, Sutton then ran behind the apartment, jumped a
fence, and continued running until he reached his home.  Sutton testified that no one had threatened
Davis and that the only weapon displayed while he was in the apartment was that
carried by Davis.  

            Seventeen-year-old
Morris described the horrific scene which unfolded.  She was looking forward to enjoying a movie
with Gibson and Rabozzi when Davis and Sutton arrived.  They were sitting on the futon when Davis got
up, picked up her backpack from the front of the apartment, and walked toward
the door.  Because her car keys and
wallet were in the backpack, she tried to wrestle it from Davis’s hands.  

            Rabozzi
said that Morris “reached for the bag and began grappling with [Davis], kind of
tugging at it.  And I recall him
pointedly not trying to, you know, point the gun at her, but he was roughing
her, you know, and pushing her around, trying to get her off him.”  Gibson “had gotten up when they started
tussling. . . . And after [Davis] pushed Britney to the floor,
[Gibson] made the move to go around me the opposite direction of everybody
else.”  At first, Davis held the gun
close to his chest.  Rabozzi “felt
[Gibson] move past [her], and it was at that point that I believe [Davis]
realized that [Gibson] was going for his own gun, and he aimed or he drew down
in our direction.”  Davis “held the gun
up in the air and said, mother f*****, you costed [sic] me $500” and began to
shoot the pistol.  “The gun was thunderous
from the front of the apartment.” 
Eventually, Gibson retrieved his gun and was able to return fire.  The sound of Davis’s .357 “overpowered” the “pop”
made by Gibson’s .380.  

            Belinda
Ann Williams, who was living in the Woodlands apartments, heard the gunshots as
she was checking her mail.  She saw “two
guys running from the side of the building.”  One got into a red Honda and sped off, while
the other ran behind a building.  After
the rapid exchange of gunfire ended, Davis approached Gibson, grabbed Gibson’s
and Morris’s cell phones, and rushed out of the apartment.  

            Davis
is known to have made two telephone calls shortly after the shooting.  One of those calls (to which reference has
already been made) was to Johnson, telling her to come retrieve her car.  In the other, Davis telephoned his friend
Charles Lance Matthews (who was also living in the Woodlands apartments) and
told Matthews that “he had put something on my porch and to put it up for him.”  Matthews located a pistol on his porch and took
it to a girlfriend’s mother’s home, where he hid it in a plastic toy.  

            Rabozzi
“could tell that something was wrong. 
[Gibson] wasn’t moving.”  Panic
ensued.  Rabozzi ran to the balcony and “started
yelling for a phone.”  Conquilla Rudd and
her friend heard cries for help and called the police.  Rudd went to the apartment and observed
Rabozzi with a gun.  She later learned
the gun belonged to Gibson.  Rudd wrapped
the gun in a towel.

            Officer
Ed Steger arrived at the crime scene within two minutes of the police dispatch
seeking aid.  Rudd handed him Gibson’s
.380 pistol and Williams alerted him to two cell phones that she had found on
the ground.  Steger recounted that Gibson
was lying on his back and “[t]here was a large pool of blood to the left side
of his head and what I assume was some type of brain matter.  His eyes were open.”  LifeNet arrived and Gibson was rushed to the
hospital, where he died later in the night from a gunshot wound to the
head.  

            Johnson
walked to the home of her neighbor Robert Jackson and asked for a ride to the
Woodlands so she could get her car. 
Ambulances and police cluttered the parking lot as Jackson pulled his
automobile onto the grounds of the Woodlands. 
They discovered Davis sitting on some steps and waiting for her
arrival.  Seeing her, Davis then told
Johnson that Gibson “went crazy and started shooting at him so he ran” and that
he could not drive the Honda because he “knew [the] car was going to be pulled
over.”  Davis jumped into Jackson’s car
while Johnson got out, started her red Honda, and left for home alone.  Davis asked Jackson to drop him off before
arriving home.  When Jackson pulled into
his driveway, the police were already at Davis’s house next door.  Next, Sutton came to Jackson’s house and
nervously asked him for advice as to what to tell the police.  He told Sutton to turn himself in and tell
the truth.  

            Johnson,
who had driven the red Honda home, noticed that Davis was not there.  Although Davis was not there, police were, and
Officer Joshua Laster questioned her.  While
Laster was questioning Johnson, she received a call on her cell phone from a
land line.  The phone was confiscated
and, from the telephone number shown for the last call received, the call was
determined to have originated at an address on Beech Street in Texarkana.  Upon going to that address, Laster located
Davis sitting with a friend on the front porch of the house located there.  Davis identified himself with the fictitious
name of Thomas Johnson and provided a false birth date as well.  He was detained after confirmation that the
identity was false.  

            Davis
was placed in an interrogation room after being taken into custody.  After Detective Matt Cashatt “heard some
furniture banging around in that room,” he looked through the door’s peephole
and observed Davis dusting himself off. 
When Cashatt entered the room, he discovered that Davis had pulled down
ceiling tiles and the surrounding aluminum framework in an apparent effort to
escape, leaving a large hole in the ceiling. 
Cashatt placed Davis in handcuffs and left.  Cashatt “immediately went back to that room’s
observation window and observed [Davis] transfer his cuffs from behind his back
. . . under his feet to the front, and he began to tug on his cuffs.”  Fearing Davis might continue trying to
escape, Cashatt placed him in a maximum security cell.  Cashatt later discovered that Davis had
draped a wad of wet tissue over the observation camera in an effort to obscure
the quality of video in the interrogation room. 


            An
interview was conducted the following day during which Davis stated that Gibson
shot at him first.  The version of events
Davis gave changed throughout the interview. 
Finally, he admitted to taking a gun to Gibson’s house because he was “mad
cuz the fool cost me $500.”  Davis said
he fired six or eight shots with a .357 pistol, that “I shot the dude, I did
it,” and admitted he left the gun on Matthews’s porch.  After the termination of the interview, Davis
again attempted to escape through the ceiling after officers left the
room.  

            Despite
the accounts above given at trial, Davis argues the evidence was legally and
factually insufficient to prove he committed murder.  Specifically, he argues that Gibson was
killed with a fragment of a bullet discharged from Gibson’s own gun and that
there is no evidence to rebut that assertion. 


II.        The Jury’s Verdict Was
Supported by Legally and Factually Sufficient Evidence 

            The Fourteenth
Amendment’s due process guarantee “prohibits a criminal defendant from being
convicted of an offense and denied his liberty except upon proof sufficient to
persuade a rational fact finder of guilt beyond a reasonable doubt.”  Swearingen
v. State, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003).  

            A.        The Hypothetically-Correct Jury Charge

            Our
analysis of whether the proof is sufficient is measured against the elements of
a hypothetically-correct murder jury charge.[1]
 Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); see also Grotti v. State, 273 S.W.3d 273, 280
(Tex. Crim. App. 2008).  The
hypothetically-correct jury charge “sets out the law, is authorized by the
indictment, does not unnecessarily increase the State’s burden of proof or
unnecessarily restrict the State’s theories of liability, and adequately
describes the particular offense for which the defendant was tried.”  Malik, 953 S.W.2d at 240.  It is used to evaluate both legal and factual
sufficiency.  Grotti, 273 S.W.3d
at 281.  

            Davis
was indicted for intentionally or knowingly causing Gibson’s death in violation
of Section 19.02 of the Texas Penal Code. 
Tex. Penal Code Ann. § 19.02
(Vernon 2003).  Under a hypothetically-correct
charge in this case, the jury was required to find, beyond a reasonable doubt,
that:  (1) Davis; (2) intentionally or
knowingly; (3) caused the death; (4) of Gibson. 
Id.  Davis acted
intentionally if it was his “conscious objective or desire to engage in the
conduct or cause the result.”  Tex. Penal Code Ann. § 6.03(a) (Vernon 2003).  He acted knowingly if he was “aware that his
conduct [was] reasonably certain to cause the result.”  Tex.
Penal Code Ann. § 6.03(b) (Vernon 2003). 


            B.        The
Evidence Was Legally Sufficient to Prove Davis Caused Gibson’s Death 

            The requirement of legal sufficiency confirms that a
fact question was raised by the evidence. 
Clewis v. State, 922 S.W.2d 126, 133 (Tex. Crim. App.
1996).  If the evidence in this case was
insufficient to raise an issue of Davis’s guilt, there was no issue for the
jury’s resolution.  Id.  When conducting a legal sufficiency analysis,
we review all of the evidence in the light most favorable to the verdict and
determine whether any rational jury could find the essential elements as
charged by the indictment beyond a reasonable doubt.  Hooper v. State, 214 S.W.3d 9, 13
(Tex. Crim. App. 2007); Lacour v. State, 8 S.W.3d 670, 671 (Tex. Crim.
App. 2000) (citing Jackson v. Virginia, 443 U.S. 307 (1979)); Clewis,
922 S.W.2d at 132–33; Saxton v. State, 804 S.W.2d 910, 914 (Tex.
Crim. App. 1991). 

            Here,
all of the witnesses at trial and Davis’s own confession, identified Davis as
the shooter.  There was also evidence
that Gibson’s death was caused by a bullet wound to the head.  The jury could connect the dots.  This leaves the elements of mens rea and causation. 

            Davis’s
requisite culpable mental state could be inferred from surrounding
circumstances, his acts, words, and conduct. 
Patrick v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); Ledesma
v. State, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984); Dunn v. State,
13 S.W.3d 95, 98–99 (Tex. App.––Texarkana 2000, no pet.).  He had previously committed a crime against
Gibson and made threats that he planned on killing him after he bonded out of
jail.  He made a calculated decision to
borrow a gun from a friend, clean it on the day of the murder, and begged for
his girlfriend’s car to take to the Woodlands, where Gibson lived.  He took someone who did not know Gibson,
instead of going alone.  Anger over the
cost of the bond was apparent when he yelled “you costed [sic] me $500” to
Gibson before shooting at him.  “Motive
is a significant circumstance indicating guilt.”  Guevara
v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).  Undoubtedly, any rational juror could find
beyond a reasonable doubt at this point that Davis was aware that shooting a
gun in Gibson’s direction was reasonably certain to cause death.  Castillo v. State, 899 S.W.2d 391, 394
(Tex. App.––Houston [14th Dist.] 1995, no pet.); Murray v. State, 861 S.W.2d 47, 53 (Tex. App.––Texarkana 1993, pet.
ref’d).  Also, “[t]here is no evidence
that, in doing the act, he intended only to injure and not to kill.”  Murray,
861 S.W.2d at 53. 

            Davis’s
actions after the murder were further indications of guilt.  He dropped the gun off at a friend’s porch,
instructed his friend to get rid of the evidence, and called his girlfriend to
pick up her car so he would not get pulled over in it.  He grabbed Gibson’s and Morris’s cell phones
so they could not be used to call for help and dropped them on the ground in
the Woodlands to avoid being caught with them. 
Instead of going home, he had Jackson drop him off at a friend’s street
and lied to the police about his name after he was found.  When taken into custody, he repeatedly
desperately tried to escape.  Evidence of
flight is another circumstance from which the jury can draw an inference of
guilt.  Bigby v. State, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994).  We find that a rational juror could have
determined Davis had the requisite mens rea.  

            Unfortunately,
the bullet fragment removed from Gibson’s brain, which appeared to be the core
of a jacketed bullet, could not be matched up with any particular gun.  Davis’s 
primary contention (i.e., that there is no proof that it was a bullet
fragment from his gun versus a fragment from Gibson’s gun that killed Gibson)
focuses our attention to causation.  We
note that the gist of Davis’s theory is addressed by statute:  “A person is criminally responsible if the
result would not have occurred but for his conduct, operating either alone or
concurrently with another cause, unless the concurrent cause was clearly
sufficient to produce the result and the conduct of the actor clearly
insufficient.”  Tex. Penal Code Ann. § 6.04 (Vernon 2003).  Here, before the gunfight ever took place,
Davis expressed an intention to kill Gibson and after the encounter, Davis
specifically admitted that “I shot him, I did it.”  By his own words, Davis acknowledged that it
was a bullet from the gun he was using which killed Gibson and not some errant
ricochet from Gibson’s gun.

            Further,
other evidence seems to ratify Davis’s statement.  It appeared that six bullets, (numbered one
through six) were fired from the front of the apartment, whereas two (numbered
seven and eight) were fired from the middle and back of the apartment toward
the front door.  Morris and Rabozzi both
described Davis as holding his gun high in the air, pointing it downward and
shooting while standing close to the front of the apartment.  Bullets one and two hit a wall separating the
front of the apartment from the kitchen. 
The bullets entered on the side of the wall facing the front door.  Bullet three hit the kitchen counter in an
obvious downward direction, bullet four entered the wall nine and one-half
inches from the floor, bullet five also hit a wall one foot above the floor,
and bullet six went through a bed in the apartment and lodged itself in the wall,
one foot four inches above the floor. 
Evidence that bullets one through six were fired by Davis was
corroborated by his own statement during the interview.  Officer Shawna Yonts, who investigated the
apartment scene, stated that bullets one through six were travelling from right
to left, while bullets seven and eight were travelling in a different
direction.  Not only did these bullets
appear to have been fired from the front from right to left, but they seemed to
be travelling in a downward direction.[2]  This evidence (that six bullets shot from the
front door at a right to left downward trajectory) is important for one reason.





 
 
 
 
 
 
 


 

 

 

 

 

 

 

 

 

 

 



            Gibson’s
autopsy report said “[o]n the left side of the head, there is a 3/4 inch in
diameter, irregular, stellate gunshot wound . . . . The trajectory of the
bullet is left to right, slightly downward, with no significant front or back
deviation.”[3]  If Gibson was facing Davis while he shot at
him, as Morris and Rabozzi testified, the general trajectory of the bullet as
it entered his body was consistent with the trajectory of bullets one through
six, which sufficient evidence establishes were fired by Davis as he stood at
the front of the apartment firing from his right to left.  Dr. Daniel Lingamfelter, who conducted the
autopsy, testified he did not believe the wound was self-inflicted.  A rational juror could find Davis was the
person holding the gun which ejected a bullet that killed Gibson. 

            We
conclude the evidence was legally sufficient to support the finding that Davis
intentionally or knowingly caused Gibson’s death. 

            C.        The
Evidence Was Factually Sufficient to Support the Verdict 

            Unlike
legal sufficiency review, we examine the evidence in a neutral light when
assessing factual sufficiency and determine whether the proof of guilt is so obviously
weak as to undermine confidence in the verdict, or, if taken alone, is greatly
outweighed by contrary proof so as to be clearly wrong and unjust.  Laster v. State, 275 S.W.3d 512, 518
(Tex. Crim. App. 2009); Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); Cain v.
State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); Harris v. State,
133 S.W.3d 760, 764 (Tex. App.—Texarkana 2004, pet. ref’d).  A clearly wrong and unjust verdict is
manifestly unjust, shocks the conscience or clearly demonstrates bias.  Santellan v. State, 939 S.W.2d 155, 164
(Tex. Crim. App. 1997).  Because factual
sufficiency is an issue of fact, we are not free to reweigh the evidence and
set aside the verdict merely because we feel a different result is more
reasonable.  Clewis, 922 S.W.2d at
135. 

            Thus,
if we determined the evidence raised issues for the jury’s resolution, we will
not sit as the thirteenth juror, re-evaluating the weight and credibility of
the evidence.  Williams v. State,
235 S.W.3d 742, 750 (Tex. Crim. App. 2007); Dewberry v. State, 4 S.W.3d
735, 740 (Tex. Crim. App. 1999). 
Instead, we give full play to the jury’s responsibility to weigh the
evidence, resolve conflicts in the testimony, and draw reasonable inferences
from basic facts.  Johnson, 23
S.W.3d at 7; Clewis, 922 S.W.2d at 133; Bottenfield v. State,
77 S.W.3d 349, 354 (Tex. App.—Fort Worth 2002, pet. ref’d) (citing Jackson,
443 U.S. at 319). 

            Aside
from witness attacks on credibility and memory, which the jury was free to
resolve, Davis makes three arguments suggesting that the evidence was factually
insufficient in his brief.  First, he
makes the (rather incredible) claim that the State failed to put on any
evidence that Davis intended to do harm. 
Amazingly, he cites Cunningham’s testimony and suggests it somehow
stands for the proposition that Davis intended not to harm Gibson.  We disagree completely.  Cunningham testified Davis said, “he was
going to go over to [Gibson]’s house and kill him.”  That he also said “I’m just going to go over
there and take his s*** and get my money back” does nothing to “negate” Davis’s
death threat.  

            Next, Davis cites the following
exchange in the record:

            Q         [The State]
Did any of the three of you pull a gun prior to [Gibson] pulling his?

 

            A         [Morris] No,
sir. 

 

A review of the record indicates
that the State misspoke and did not catch the mistake in the names, but the
context is clear.  Earlier, Morris had
clearly testified that Gibson did not have a gun when Davis pulled out his
weapon.  Her description of the
occurrence clarified that Davis was first to draw his weapon and Morris also
spoke in terms of Gibson returning fire. 
Rabozzi’s testimony further clarified that Davis shot at Gibson before
Gibson could retrieve his gun. 

            Finally,
Davis maintains that there was no testimony that Gibson was killed by a bullet
fragment from a bullet which came from Davis’s gun.  However, testimony that Gibson was killed by
a bullet wound to the head, coupled with the trajectory of the bullets in the
apartment, provided a jury with ample evidence to find otherwise.   

            In
reviewing all of the evidence in a neutral light, we cannot say the evidence of
Davis’s guilt was greatly outweighed by testimony or evidence reflecting the
defensive theory.  We find nothing unjust
or shocking about the verdict and conclude the evidence was factually
sufficient to support it.  

III.       The Trial Court Did Not
Abuse Its Discretion in Admitting Photographs 

            “The
admissibility of a photograph is within the sound discretion of the trial
judge.” Paredes v. State, 129 S.W.3d
530, 539 (Tex. Crim. App. 2004); see also
McCarty v. State, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008); Casey
v. State, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).  A trial court abuses its
discretion if its decision is outside the zone of reasonable disagreement.  McCarty, 257 S.W.3d at 239 (citing Zuliani,
97 S.W.3d at 595).  Unless there is clear
abuse of the trial court’s discretion, its ruling will not be reversed.  Id.


            At trial, the State admitted photographs of Gibson in the hospital
after he had died.  Davis makes an
elaborate argument that these photographs were “offered solely to inflame the
jury” and that the probative value of the pictures was substantially outweighed
by the danger of unfair prejudice.  He
cites cases referencing Rule 403 of the Texas Rules of Evidence.  Tex. R.
Evid. 403.  However, no such issue
has been preserved for our review.[4]  Instead, the record reveals that counsel had
not made a reference to the inflammatory nature of the photographs but had,
instead, made a mere objection to relevance under Rule 401 of the Texas Rules
of Evidence.

            Relevant evidence is “evidence
having any tendency to make the existence of any fact that is of consequence to
the determination of the action more probable or less probable than it would be
without the evidence.”  Tex. R. Evid. 401.  The threshold for relevance is low.  Ex parte Moreno, 245 S.W.3d 419, 425
n.20 (Tex. Crim. App. 2008) (citing Tennard v. Dretke, 542 U.S. 274, 285
(2004)).  “A photograph is generally
admissible if verbal testimony about the matters depicted in the photograph is
also admissible.”  Luna v. State,
264 S.W.3d 821, 829 (Tex. App.––Eastland 2008, no pet.) (citing Paredes,
129 S.W.3d at 539).  A trial court does
not err in admitting photographs merely because they are gruesome.  Paredes, 129 S.W.3d at 540. 

            The State was required
to prove Gibson’s death was caused by a gunshot wound to the head.[5]  The photographs were taken as a part of Yonts’s
investigation and were used to explain the manner and circumstances of
death.  Therefore, although the
photographs may have been gruesome, they were relevant.  We conclude that the trial court did not
abuse its discretion in overruling Davis’s Rule 401 objection.  This point of error is overruled. 

IV.       Davis Was Not Entitled
to an Instruction to the Jury of a Lesser-Included Offense 

            Davis
next argues that the trial court erred in refusing to submit an instruction on
what Davis claims was the lesser-included offense of deadly conduct.[6]  While deadly conduct, under the proper
circumstances, can be deemed a lesser-included offense of murder, Davis would
only be entitled to the jury instruction if there was ‘“some evidence’ that, if
the defendant is guilty, he is guilty only of the lesser-included offense.”  Flores
v. State, 245 S.W.3d 432, 439 (Tex. Crim. App. 2008); Ortiz v. State, 144 S.W.3d 225, 233–35 (Tex. App.––Houston [14th
Dist.] 2004, pet. ref’d).  

            The
element distinguishing deadly conduct from murder is the mens rea.  Here, Davis claims
the following evidence negates the elements of murder:  (1) Cunningham’s erroneously interpreted
testimony regarding the nature of the threat to Gibson; (2) “[t]hat [Davis]
specifically avoided pointing the gun at [Morris][7] . .
. when the scuffle for the backpack occurred”; (3) the erroneous contention
(based on Morris’s misspeak[8])
that Davis was not the first to pull a gun; and (4) the theory that the bullet
fragment ricochet which slew Gibson was not a deliberate shot.  Davis also says “the location of the bullet
holes at the crime scene show that the shots were strewn about the room, clearly
showing that any shots fired by [Davis] were done so recklessly.”  We conclude this “evidence” does not negate
the elements of murder; the jury could conclude that the fact that the small
apartment was liberally sprayed with gunshots was simply evidence of poor
marksmanship and this did nothing to absolve him from intent.  Again, Cunningham testified Davis said he was
going to kill Gibson.  The fact that he
also stated he was going to rob Gibson does not negate the greater
offense.  The record says Davis, who drew
a gun first, avoided only pointing it at Morris during the scuffle, and thus
again does not negate the greater offense. 
Even if Davis’s statement during his interview (during which he stated
that Gibson shot first) was to be believed, the idea that Davis intentionally
or knowingly caused Gibson’s death when he supposedly returned fire would not
have been cancelled out.  No evidence was
introduced suggesting that the ricochet was not a deliberate shot.  In fact, Davis said “I shot him, I did it.”  Further, the idea that six rounds were fired
before one reached its mark does not suggest the shots were fired only
recklessly.  We conclude that because
this was not “some evidence” negating the greater offense and supporting the
idea that Davis was guilty only of the lesser-included offense, the trial court
did not abuse its discretion in failing to submit an instruction on deadly
conduct.  

            This
point of error is overruled. 

V.        Victim Impact Evidence
During Punishment 

            Finally, Davis
complains that the trial court erroneously allowed improper victim impact
evidence through Gibson’s mother during the punishment phase of the trial.  The record shows that there was no error
committed here and even if error had been committed, the record demonstrates
that the testimony regarding this issue was not preserved for our review.  

            Prior
to the victim’s mother taking the stand, Davis’s counsel made a mere Rule 403
objection.  After the court overruled the
objection, counsel asked for a running objection to the mother’s
testimony.  Without prompting, the trial
court found “that based on the authority of the Court of Criminal Appeals in Salazar v. State[9] that
it is permissible for victim impact testimony to come in to show the uniqueness
of the individual in the case.  However,
[Prosecutor], the Court will direct you and warn you to stay within the proper
parameters of those guidelines.”  The
trial court went on to say, “[A]s far as a running objection on the fact of her
testifying, I’ll grant you.  If you feel
like it’s getting outside the scope of the testimony, you need to make those
objections because I can’t . . . . That’s hard to do a running objection on
that portion of it.”  Despite Davis’s understanding
that the court would require objection if counsel believed that the testimony
went beyond permissible victim impact testimony, the following exchange
occurred without objection:  

            Q         And has this loss, his loss, had a
terrible impact on your family?  

 

            A         Yes. 
His brother cannot even be here at this trial.  Emotionally he can’t take this.  My mother is eighty-six years old.  This is killing her slowly, and it’s killing
me to watch this.  And my sister, she’s
-- we’re a very close family. . . . . His brother is
devastated.  They’re only fourteen months
apart in age, so growing up they were inseparable, always together.  Wherever there was [Gibson], there was Drew .
. . .

 

            The
trial court was well advised to look to Salazar
for guidance in this matter.  In it, the
Texas Court of Criminal Appeals observed that

As a general proposition, victim-impact evidence
may be admissible at the punishment stage of a criminal trial when that
evidence has some bearing on the defendant’s personal responsibility and moral
culpability.  As the Supreme Court stated
in Payne v. Tennessee, such evidence
is “designed to show . . . each
victim’s ‘uniqueness as an individual human being,’” and is a way to inform “the
sentencing authority about the specific harm caused by the crime in question.”  Such evidence is of two distinct, but
related, types:  victim character evidence and victim impact evidence.  The former is designed to give the jury “a
quick glimpse of the life that the petitioner chose to extinguish, to remind
the jury that the person whose life was taken was a unique human being.”  The latter is designed to remind the jury that
murder has foreseeable consequences to the community and the victim’s
survivors-family members and friends who also suffer harm from murderous
conduct. 

 

Salazar, 90 S.W.3d at 335 (footnotes omitted).

            Davis
made no objection concerning any possible hearsay in the testimony.  We do not find that the testimony about which
Davis now complains violated the parameters of permissible victim impact
testimony as described in Salazar.  Even if it had gone out of bounds, Davis’s
failure to object and preserve error left us with nothing to address.[10]  

            Even
had timely objection been made and even though the impact would certainly have
some emotional influence, it falls within the parameters of such proof as set
out by Salazar.  We overrule this point of error.  

VI.       Conclusion 

            We affirm the
judgment of the trial court. 

 

 

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

Date Submitted:          February
16, 2010

Date Decided:             March
5, 2010

 

Do Not Publish











[1]Malik
controls “even in the absence of alleged jury charge error.”  Gollihar v. State, 46 S.W.3d 243, 255
(Tex. Crim. App. 2001). 





[2]Bullet
eight appeared to have an upward trajectory as it entered through the door,
with bullet seven hitting the front wall in the same direction.  





[3]The
report indicated the bullet went through an object, broke up, and then hit Gibson.  





[4]To
preserve error for appellate review:  (1)
the complaining party must make a timely objection specifying the grounds for
the objection, if the grounds are not apparent from the context; (2) the
objection must be made at the earliest possible opportunity; and (3) the
complaining party must obtain an adverse ruling from the trial court.  See Tex. R. App. P. 33.1(a)(1). 

 





[5]We
note that there was no stipulation in this record as to the cause of Gibson’s
death.  In any event, the Texas Court of
Criminal Appeals has determined that an offer to stipulate to the cause of
death of a victim does not preclude admission of photographs demonstrating the
cause, and does not render them less probative. 
Newbury v. State, 135 S.W.3d
22, 43–44 (Tex. Crim. App. 2004) (autopsy photographs held admissible over
offer to stipulate to means of death as gunshot wound). 

 





[6]Davis
asks us to modify the judgment to reflect conviction of deadly conduct.  A court of appeals may modify a judgment of
conviction to reflect conviction of a lesser-included offense if it finds that
the evidence is legally insufficient to support conviction of the charged offense,
but sufficient to support conviction of the lesser-included offense.  Herrin v. State, 125 S.W.3d 436, 443–45
(Tex. Crim. App. 2002); Lackey v. State,
290 S.W.3d 912, 920 (Tex. App.––Texarkana 2009, pet. ref’d); Murray, 861 S.W.2d at 53.

 





[7]Davis
claims that the record showed he “avoided pointing the gun at others in the
apartment when the scuffle for the backpack began.”  Again, Davis misreads the record, which only
says he avoided pointing the gun at Morris. 


 





[8]Davis
chose not to assert any self-defense claims. 





[9]Salazar v. State, 90 S.W.3d 330 (Tex.
Crim. App. 2002). 





[10]This
point of error was also not addressed in Davis’s motion for new trial.